# DASTAR CORP. *v.* TWENTIETH CENTURY FOX FILM CORP. ET AL.

No. 02–428.   Argued April 2, 2003—Decided June 2, 2003

SCALIA, J., delivered the opinion of the Court, in which all other Members joined, except BREYER, J., who took no part in the consideration or decision of the case.

*David A. Gerber* argued the cause for petitioner. With him on the briefs were *Stewart A. Baker, Bennett Evan Cooper,* and *David Nimmer.*

*Gregory G. Garre* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Clement, Anthony J. Steinmeyer,* and *Mark S. Davies.*

*Dale M. Cendali* argued the cause for respondents. With her on the briefs were *Walter E. Dellinger, Pamela A. Harris, Jonathan D. Hacker, Jeremy Maltby, Pammela Quinn,* and *Gary D. Roberts.**

JUSTICE SCALIA delivered the opinion of the Court.

In this case, we are asked to decide whether § 43(a) of the Lanham Act, 15 U. S. C. § 1125(a), prevents the unaccredited copying of a work, and if so, whether a court may double a profit award under § 1117(a), in order to deter future infringing conduct.

I

In 1948, three and a half years after the German surrender at Reims, General Dwight D. Eisenhower completed Crusade in Europe, his written account of the allied campaign in Europe during World War II. Doubleday published the book, registered it with the Copyright Office in 1948, and granted exclusive television rights to an affiliate of respondent Twentieth Century Fox Film Corporation (Fox). Fox, in turn, arranged for Time, Inc., to produce a television series, also

---

*Briefs of *amici curiae* urging reversal were filed for the International Trademark Association by *Bruce R. Ewing;* and for Malla Pollack et al. by *Ms. Pollack, pro se.*

Briefs of *amici curiae* urging affirmance were filed for the Association for Competitive Technology et al. by *Paul Bender* and *Michael R. Klipper;* and for the Directors Guild of America et al. by *Richard P. Bress.*

Briefs of *amici curiae* were filed for the American Intellectual Property Law Association by *William G. Barber, Louis T. Pirkey,* and *Ronald E. Myrick;* for the American Library Association et al. by *Jonathan Band* and *Peter Jaszi;* and for Intellectual Property Law Professors by *Tyler T. Ochoa.*

called Crusade in Europe, based on the book, and Time assigned its copyright in the series to Fox. The television series, consisting of 26 episodes, was first broadcast in 1949. It combined a soundtrack based on a narration of the book with film footage from the United States Army, Navy, and Coast Guard, the British Ministry of Information and War Office, the National Film Board of Canada, and unidentified "Newsreel Pool Cameramen." In 1975, Doubleday renewed the copyright on the book as the " 'proprietor of copyright in a work made for hire.' " App. to Pet. for Cert. 9a. Fox, however, did not renew the copyright on the Crusade television series, which expired in 1977, leaving the television series in the public domain.

In 1988, Fox reacquired the television rights in General Eisenhower's book, including the exclusive right to distribute the Crusade television series on video and to sublicense others to do so. Respondents SFM Entertainment and New Line Home Video, Inc., in turn, acquired from Fox the exclusive rights to distribute Crusade on video. SFM obtained the negatives of the original television series, restored them, and repackaged the series on videotape; New Line distributed the videotapes.

Enter petitioner Dastar. In 1995, Dastar decided to expand its product line from music compact discs to videos. Anticipating renewed interest in World War II on the 50th anniversary of the war's end, Dastar released a video set entitled World War II Campaigns in Europe. To make Campaigns, Dastar purchased eight beta cam tapes of the *original* version of the Crusade television series, which is in the public domain, copied them, and then edited the series. Dastar's Campaigns series is slightly more than half as long as the original Crusade television series. Dastar substituted a new opening sequence, credit page, and final closing for those of the Crusade television series; inserted new chapter-title sequences and narrated chapter introductions; moved the "recap" in the Crusade television series to the

beginning and retitled it as a "preview"; and removed references to and images of the book. Dastar created new packaging for its Campaigns series and (as already noted) a new title.

Dastar manufactured and sold the Campaigns video set as its own product. The advertising states: "Produced and Distributed by: *Entertainment Distributing*" (which is owned by Dastar), and makes no reference to the Crusade television series. Similarly, the screen credits state "DASTAR CORP presents" and "an ENTERTAINMENT DISTRIBUTING Production," and list as executive producer, producer, and associate producer employees of Dastar. Supp. App. 2–3, 30. The Campaigns videos themselves also make no reference to the Crusade television series, New Line's Crusade videotapes, or the book. Dastar sells its Campaigns videos to Sam's Club, Costco, Best Buy, and other retailers and mail-order companies for $25 per set, substantially less than New Line's video set.

In 1998, respondents Fox, SFM, and New Line brought this action alleging that Dastar's sale of its Campaigns video set infringes Doubleday's copyright in General Eisenhower's book and, thus, their exclusive television rights in the book. Respondents later amended their complaint to add claims that Dastar's sale of Campaigns "without proper credit" to the Crusade television series constitutes "reverse passing off"[1] in violation of § 43(a) of the Lanham Act, 60 Stat. 441, 15 U. S. C. § 1125(a), and in violation of state unfair-competition law. App. to Pet. for Cert. 31a. On cross-motions for summary judgment, the District Court found for respondents on all three counts, *id.*, at 54a–55a, treating its

---

[1] Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's. See, *e. g., O. & W. Thum Co.* v. *Dickinson*, 245 F. 609, 621 (CA6 1917). "Reverse passing off," as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own. See, *e. g., Williams* v. *Curtiss-Wright Corp.*, 691 F. 2d 168, 172 (CA3 1982).

resolution of the Lanham Act claim as controlling on the state-law unfair-competition claim because "the ultimate test under both is whether the public is likely to be deceived or confused," *id.*, at 54a. The court awarded Dastar's profits to respondents and doubled them pursuant to § 35 of the Lanham Act, 15 U. S. C. § 1117(a), to deter future infringing conduct by petitioner.

The Court of Appeals for the Ninth Circuit affirmed the judgment for respondents on the Lanham Act claim, but reversed as to the copyright claim and remanded. 34 Fed. Appx. 312, 316 (2002). (It said nothing with regard to the state-law claim.) With respect to the Lanham Act claim, the Court of Appeals reasoned that "Dastar copied substantially the entire *Crusade in Europe* series created by Twentieth Century Fox, labeled the resulting product with a different name and marketed it without attribution to Fox[, and] therefore committed a 'bodily appropriation' of Fox's series." *Id.*, at 314. It concluded that "Dastar's 'bodily appropriation' of Fox's original [television] series is sufficient to establish the reverse passing off." *Ibid.*[2] The court also affirmed the District Court's award under the Lanham Act of twice Dastar's profits. We granted certiorari. 537 U. S. 1099 (2003).

## II

The Lanham Act was intended to make "actionable the deceptive and misleading use of marks," and "to protect persons engaged in . . . commerce against unfair competition." 15 U. S. C. § 1127. While much of the Lanham Act addresses

---

[2] As for the copyright claim, the Ninth Circuit held that the tax treatment General Eisenhower sought for his manuscript of the book created a triable issue as to whether he intended the book to be a work for hire, and thus as to whether Doubleday properly renewed the copyright in 1976. See 34 Fed. Appx., at 314. The copyright issue is still the subject of litigation, but is not before us. We express no opinion as to whether petitioner's product would infringe a valid copyright in General Eisenhower's book.

the registration, use, and infringement of trademarks and related marks, § 43(a), 15 U. S. C. § 1125(a) is one of the few provisions that goes beyond trademark protection. As originally enacted, § 43(a) created a federal remedy against a person who used in commerce either "a false designation of origin, or any false description or representation" in connection with "any goods or services." 60 Stat. 441. As the Second Circuit accurately observed with regard to the original enactment, however—and as remains true after the 1988 revision—§ 43(a) "does not have boundless application as a remedy for unfair trade practices," *Alfred Dunhill, Ltd.* v. *Interstate Cigar Co.,* 499 F. 2d 232, 237 (1974). "[B]ecause of its inherently limited wording, § 43(a) can never be a federal 'codification' of the overall law of 'unfair competition,'" 4 J. McCarthy, Trademarks and Unfair Competition § 27:7, p. 27–14 (4th ed. 2002) (McCarthy), but can apply only to certain unfair trade practices prohibited by its text.

Although a case can be made that a proper reading of § 43(a), as originally enacted, would treat the word "origin" as referring only "to the geographic location in which the goods originated," *Two Pesos, Inc.* v. *Taco Cabana, Inc.,* 505 U. S. 763, 777 (1992) (STEVENS, J., concurring in judgment),[3] the Courts of Appeals considering the issue, begin-

---

[3] In the original provision, the cause of action for false designation of origin was arguably "available only to a person doing business in the locality falsely indicated as that of origin," 505 U. S., at 778, n. 3. As adopted in 1946, § 43(a) provided in full:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or the region in which said locality is situated, or by any person who believes that he is or is

ning with the Sixth Circuit, unanimously concluded that it "does not merely refer to geographical origin, but also to origin of source or manufacture," *Federal-Mogul-Bower Bearings, Inc.* v. *Azoff,* 313 F. 2d 405, 408 (1963), thereby creating a federal cause of action for traditional trademark infringement of unregistered marks. See 4 McCarthy § 27:14; *Two Pesos, supra,* at 768. Moreover, every Circuit to consider the issue found § 43(a) broad enough to encompass reverse passing off. See, *e. g., Williams* v. *Curtiss-Wright Corp.,* 691 F. 2d 168, 172 (CA3 1982); *Arrow United Indus., Inc.* v. *Hugh Richards, Inc.,* 678 F. 2d 410, 415 (CA2 1982); *F. E. L. Publications, Ltd.* v. *Catholic Bishop of Chicago,* 214 USPQ 409, 416 (CA7 1982); *Smith* v. *Montoro,* 648 F. 2d 602, 603 (CA9 1981); *Bangor Punta Operations, Inc.* v. *Universal Marine Co.,* 543 F. 2d 1107, 1109 (CA5 1976). The Trademark Law Revision Act of 1988 made clear that § 43(a) covers origin of production as well as geographic origin.[4] Its language is amply inclusive, moreover, of reverse passing off—if indeed it does not implicitly adopt the unanimous court-of-appeals jurisprudence on that subject. See, *e. g.,*

---

likely to be damaged by the use of any such false description or representation." 60 Stat. 441.

[4] Section 43(a) of the Lanham Act now provides:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

"(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

"(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

"shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U. S. C. § 1125(a)(1).

*Alpo Petfoods, Inc.* v. *Ralston Purina Co.*, 913 F. 2d 958, 963–964, n. 6 (CADC 1990) (Thomas, J.).

Thus, as it comes to us, the gravamen of respondents' claim is that, in marketing and selling Campaigns as its own product without acknowledging its nearly wholesale reliance on the Crusade television series, Dastar has made a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin . . . of his or her goods." § 43(a). See, *e. g.*, Brief for Respondents 8, 11. That claim would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own. Dastar's alleged wrongdoing, however, is vastly different: It took a creative work in the public domain—the Crusade television series—copied it, made modifications (arguably minor), and produced its very own series of videotapes. If "origin" refers only to the manufacturer or producer of the physical "goods" that are made available to the public (in this case the videotapes), Dastar was the origin. If, however, "origin" includes the creator of the underlying work that Dastar copied, then someone else (perhaps Fox) was the origin of Dastar's product. At bottom, we must decide what § 43(a)(1)(A) of the Lanham Act means by the "origin" of "goods."

## III

The dictionary definition of "origin" is "[t]he fact or process of coming into being from a source," and "[t]hat from which anything primarily proceeds; source." Webster's New International Dictionary 1720–1721 (2d ed. 1949). And the dictionary definition of "goods" (as relevant here) is "[w]ares; merchandise." *Id.*, at 1079. We think the most natural understanding of the "origin" of "goods"—the source of wares—is the producer of the tangible product sold in the marketplace, in this case the physical Campaigns videotape sold by Dastar. The concept might be stretched (as it was

under the original version of § 43(a))[5] to include not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ("stood behind") production of the physical product. But as used in the Lanham Act, the phrase "origin of goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain. Such an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent.

Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill. It forbids, for example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product. But the brand-loyal consumer who prefers the drink that the Coca-Cola Company or PepsiCo sells, while he believes that that company produced (or at least stands behind the production of) that product, surely does not necessarily believe that that company was the "origin" of the drink in the sense that it was the very first to devise the formula. The consumer who buys a branded product does not automatically assume that the brand-name company is the same entity that came up with the idea for the product, or designed the product—and typically does not care whether it is. The words of the Lan-

---

[5] Under the 1946 version of the Act, § 43(a) was read as providing a cause of action for trademark infringement even where the trademark owner had not itself produced the goods sold under its mark, but had licensed others to sell under its name goods produced by them—the typical franchise arrangement. See, e. g., My Pie Int'l, Inc. v. Debould, Inc., 687 F. 2d 919 (CA7 1982). This stretching of the concept "origin of goods" is seemingly no longer needed: The 1988 amendments to § 43(a) now expressly prohibit the use of any "word, term, name, symbol, or device," or "false or misleading description of fact" that is likely to cause confusion as to "affiliation, connection, or association . . . with another person," or as to "sponsorship, or approval" of goods. 15 U. S. C. § 1125(a).

ham Act should not be stretched to cover matters that are typically of no consequence to purchasers.

It could be argued, perhaps, that the reality of purchaser concern is different for what might be called a communicative product—one that is valued not primarily for its physical qualities, such as a hammer, but for the intellectual content that it conveys, such as a book or, as here, a video. The purchaser of a novel is interested not merely, if at all, in the identity of the producer of the physical tome (the publisher), but also, and indeed primarily, in the identity of the creator of the story it conveys (the author). And the author, of course, has at least as much interest in avoiding passing off (or reverse passing off) of his creation as does the publisher. For such a communicative product (the argument goes) "origin of goods" in § 43(a) must be deemed to include not merely the producer of the physical item (the publishing house Farrar, Straus and Giroux, or the video producer Dastar) but also the creator of the content that the physical item conveys (the author Tom Wolfe, or—assertedly—respondents).

The problem with this argument according special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically. The right to copy, and to copy without attribution, once a copyright has expired, like "the right to make [an article whose patent has expired]—including the right to make it in precisely the shape it carried when patented—passes to the public." *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 230 (1964); see also *Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, 121–122 (1938). "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc.* v. *Marketing Displays, Inc.*, 532 U. S. 23, 29 (2001). The rights of a patentee or copyright holder are part of a "carefully crafted bargain," *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 150–151 (1989), under which, once the patent or copy-

right monopoly has expired, the public may use the invention or work at will and without attribution. Thus, in construing the Lanham Act, we have been "careful to caution against misuse or over-extension" of trademark and related protections into areas traditionally occupied by patent or copyright. *TrafFix*, 532 U. S., at 29. "The Lanham Act," we have said, "does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *Id.*, at 34. Federal trademark law "has no necessary relation to invention or discovery," *Trade-Mark Cases*, 100 U. S. 82, 94 (1879), but rather, by preventing competitors from copying "a source-identifying mark," "reduce[s] the customer's costs of shopping and making purchasing decisions," and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product," *Qualitex Co.* v. *Jacobson Products Co.*, 514 U. S. 159, 163–164 (1995) (internal quotation marks and citation omitted). Assuming for the sake of argument that Dastar's representation of itself as the "Producer" of its videos amounted to a representation that it originated the creative work conveyed by the videos, allowing a cause of action under § 43(a) for that representation would create a species of mutant copyright law that limits the public's "federal right to 'copy and to use'" expired copyrights, *Bonito Boats, supra*, at 165.

When Congress has wished to create such an addition to the law of copyright, it has done so with much more specificity than the Lanham Act's ambiguous use of "origin." The Visual Artists Rights Act of 1990, § 603(a), 104 Stat. 5128, provides that the author of an artistic work "shall have the right . . . to claim authorship of that work." 17 U. S. C. § 106A(a)(1)(A). That express right of attribution is carefully limited and focused: It attaches only to specified "work[s] of visual art," § 101, is personal to the artist, §§ 106A(b) and (e), and endures only for "the life of the au-

thor," § 106A(d)(1). Recognizing in § 43(a) a cause of action for misrepresentation of authorship of noncopyrighted works (visual or otherwise) would render these limitations superfluous. A statutory interpretation that renders another statute superfluous is of course to be avoided. *E. g., Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 837, and n. 11 (1988).

Reading "origin" in § 43(a) to require attribution of uncopyrighted materials would pose serious practical problems. Without a copyrighted work as the basepoint, the word "origin" has no discernable limits. A video of the MGM film Carmen Jones, after its copyright has expired, would presumably require attribution not just to MGM, but to Oscar Hammerstein II (who wrote the musical on which the film was based), to Georges Bizet (who wrote the opera on which the musical was based), and to Prosper Mérimée (who wrote the novel on which the opera was based). In many cases, figuring out who is in the line of "origin" would be no simple task. Indeed, in the present case it is far from clear that respondents have that status. Neither SFM nor New Line had anything to do with the production of the Crusade television series—they merely were licensed to distribute the video version. While Fox might have a claim to being in the line of origin, its involvement with the creation of the television series was limited at best. Time, Inc., was the principal, if not the exclusive, creator, albeit under arrangement with Fox. And of course it was neither Fox nor Time, Inc., that shot the film used in the Crusade television series. Rather, that footage came from the United States Army, Navy, and Coast Guard, the British Ministry of Information and War Office, the National Film Board of Canada, and unidentified "Newsreel Pool Cameramen." If anyone has a claim to being the *original* creator of the material used in both the Crusade television series and the Campaigns videotapes, it would be those groups, rather than Fox. We do not

think the Lanham Act requires this search for the source of the Nile and all its tributaries.

Another practical difficulty of adopting a special definition of "origin" for communicative products is that it places the manufacturers of those products in a difficult position. On the one hand, they would face Lanham Act liability for *failing* to credit the creator of a work on which their lawful copies are based; and on the other hand they could face Lanham Act liability for *crediting* the creator if that should be regarded as implying the creator's "sponsorship or approval" of the copy, 15 U. S. C. § 1125(a)(1)(A). In this case, for example, if Dastar had simply "copied [the television series] as Crusade in Europe and sold it as Crusade in Europe," without changing the title or packaging (including the original credits to Fox), it is hard to have confidence in respondents' assurance that they "would not be here on a Lanham Act cause of action," Tr. of Oral Arg. 35.

Finally, reading § 43(a) of the Lanham Act as creating a cause of action for, in effect, plagiarism—the use of otherwise unprotected works and inventions without attribution—would be hard to reconcile with our previous decisions. For example, in *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U. S. 205 (2000), we considered whether product-design trade dress can ever be inherently distinctive. Wal-Mart produced "knockoffs" of children's clothes designed and manufactured by Samara Brothers, containing only "minor modifications" of the original designs. *Id.*, at 208. We concluded that the designs could not be protected under § 43(a) without a showing that they had acquired "secondary meaning," *id.*, at 214, so that they " 'identify the source of the product rather than the product itself,' " *id.*, at 211 (quoting *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 851, n. 11 (1982)). This carefully considered limitation would be entirely pointless if the "original" producer could turn around and pursue a reverse-passing-off claim under exactly the same provision of the Lanham Act. Sa-

mara would merely have had to argue that it was the "origin" of the designs that Wal-Mart was selling as its own line. It was not, because "origin of goods" in the Lanham Act referred to the producer of the clothes, and not the producer of the (potentially) copyrightable or patentable designs that the clothes embodied.

Similarly under respondents' theory, the "origin of goods" provision of §43(a) would have supported the suit that we rejected in *Bonito Boats*, 489 U. S. 141, where the defendants had used molds to duplicate the plaintiff's unpatented boat hulls (apparently without crediting the plaintiff). And it would have supported the suit we rejected in *TrafFix*, 532 U. S. 23: The plaintiff, whose patents on flexible road signs had expired, and who could not prevail on a trade-dress claim under §43(a) because the features of the signs were functional, would have had a reverse-passing-off claim for unattributed copying of his design.

In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods. Cf. 17 U. S. C. §202 (distinguishing between a copyrighted work and "any material object in which the work is embodied"). To hold otherwise would be akin to finding that §43(a) created a species of perpetual patent and copyright, which Congress may not do. See *Eldred* v. *Ashcroft*, 537 U. S. 186, 208 (2003).

The creative talent of the sort that lay behind the Campaigns videos is not left without protection. The original film footage used in the Crusade television series could have been copyrighted, see 17 U. S. C. §102(a)(6), as was copyrighted (as a compilation) the Crusade television series, even though it included material from the public domain, see

§ 103(a). Had Fox renewed the copyright in the Crusade television series, it would have had an easy claim of copyright infringement. And respondents' contention that Campaigns infringes Doubleday's copyright in General Eisenhower's book is still a live question on remand. If, moreover, the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action—not for reverse passing off under the "confusion . . . as to the origin" provision of § 43(a)(1)(A), but for misrepresentation under the "misrepresents the nature, characteristics [or] qualities" provision of § 43(a)(1)(B). For merely saying it is the producer of the video, however, no Lanham Act liability attaches to Dastar.

\*     \*     \*

Because we conclude that Dastar was the "origin" of the products it sold as its own, respondents cannot prevail on their Lanham Act claim. We thus have no occasion to consider whether the Lanham Act permitted an award of double petitioner's profits. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.