**Kelvin WILLIAMS, individually and d/b/a Uprise Productions, Plaintiff,**

v.

**UMG RECORDINGS, INC., a Delaware corporation; Universal Music & Video Distribution, Inc., a Delaware corporation; Cash Money Records, Inc., a Texas corporation; Jeffrey Panzer, an individual; Ronald Williams, an individual; Bryan Williams, an individual; Gary Huckaby, an individual; Elston Howard, an individual, Defendants.**

**No. CV 01–3135 DT(SHx).**

United States District Court, C.D. California.

Aug. 11, 2003.

---

**8.** Docket No. 145.

**9.** Docket No. 150.

**10.** Docket No. 154.

Richard Lloyd Sherman, Craig J. Englander, Sherman & Miller, Beverly Hills, CA, Steven T. Lowe, Steven T. Lowe Law Offices, Los Angeles, CA, Ken Nathanson, Sherman & Nathanson, Beverly Hills, CA, for Plaintiff.

Jeffrey E. Scott, Jordan D. Grotzinger, Greenberg Traurig, Santa Monica, CA, Russell J. Frackman, Jeffrey D. Goldman, Nicole L. Harris, Mitchell, Silberberg & Knupp, Los Angeles, CA, for Defendants.

ORDER **GRANTING** DEFENDANTS CASH MONEY RECORDS, INC., RONALD WILLIAMS, BRYAN WILLIAMS, UMG RECORDINGS, INC., UNIVERSAL MUSIC & VIDEO DISTRIBUTION CORP. AND JEFFREY PANZER'S MOTION FOR RECONSIDERATION AND **DISMISSING** PLAINTIFF'S SECOND CLAIM FOR RELIEF FOR VIOLATION OF THE LANHAM ACT

TEVRIZIAN, District Judge.

## I. *Background*

This action is brought by Plaintiff Kelvin Williams d/b/a Uprise Productions ("Plaintiff") against Defendants UMG Recordings, Inc., Universal Music & Video Distribution, Inc., Cash Money Records, Inc., Jeffrey Panzer, Ronald Williams, Bryan Williams, Gary Huckaby and Elston Howard.

Currently before this Court is Defendants UMG Recordings, Inc., Universal Music & Video Distribution, Corp. (erroneously sued as Universal Music & Video Distribution, Inc.), Cash Money Records, Inc., Jeffrey Panzer, Ronald Williams and Bryan Williams' Motion for Reconsideration of an Order Granting in Part Defendants' Motion for Summary Judgment, which was decided and entered by Judge Kelleher on July 15, 2002 ("July Order").

### A. **Factual Summary**

The following factual summary is adopted from the underlying July Order:

Plaintiff styles himself as "a talented young film director/writer/editor." Defendant Cash Money is a record label whose principals are Defendants Ronald and Bryan Williams.[1] Cash Money has a contract with non-party Universal Records,

---

**1.** Cash Money, Ronald Williams and Bryan Williams will hereinafter be referred to collec- tively as the "Cash Money Defendants."

Inc. ("Universal"), pursuant to which Cash Money pays Defendant UMG Recordings, Inc. ("UMG") (of which Universal is a division) to manufacture and distribute its products. Defendant Panzer is a Senior Vice President of Music Video Production for Universal who also does free-lance work for the Cash Money Defendants. Defendant Universal Music & Video Distribution, Corp. ("UMVD"), an affiliate of UMG, actually distributed the film that is the subject of this suit.[2]

In February of 2000, Plaintiff, Panzer and the Cash Money Defendants collaborated on the production of a documentary. A dispute over Plaintiff's compensation subsequently developed, apparently resulting in bad blood between Plaintiff and Panzer. In the meantime, around March 2000, Plaintiff got involved in another project with Panzer and the Cash Money Defendants involving post-production work on a film entitled "Baller Blockin'."

The parties disagree as to the nature and extent of Plaintiff's involvement in the Baller Blockin' project. Plaintiff claims that Defendants contracted with him to restructure the entire film. Plaintiff contends that he re-edited and re-scored the entire film and that it incorporates his copyrighted narration script ("Narration Script"). After Baller Blockin' was released, Plaintiff discovered his name was not listed in the film's credits and initiated this lawsuit.[3]

### B. Procedural Summary

On April 5, 2001, Plaintiff filed the Complaint against Defendants and others,[4] and the case was assigned to Judge Baird

On May 31, 2001, the Universal Defendants filed an Answer.

On June 12, 2001, this case was reassigned to Judge Kelleher.

On June 26, 2001, the Cash Money Defendants filed an Answer to Complaint.

On March 29, 2002, Plaintiff filed the First Amended Complaint.[5] The FAC alleges twelve claims: (1) copyright infringement; (2) unfair competition under the Lanham Act; (3) declaratory relief; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; (6) intentional interference with prospective economic advantage (against the Universal Defendants); (7) negligent interference with prospective economic advantage (against the Universal Defendants); (8) tortious interference with contractual relations (against the Universal Defendants); (9) fraud; (10) breach of implied agreement; (11) unjust enrichment; and (12) quantum meruit.

On April 1, 2002, the Cash Money Defendants filed a Motion for Summary Judgment of claims one through five and nine. That same day, the Universal Defendants filed a Motion for Summary Judgment of the first nine claims.

On April 15, 2002, the Cash Money Defendants filed an Answer to First Amended Complaint.

On April 19, 2002, the Universal Defendants filed an Answer to First Amended Complaint.

On July 12, 2002, Judge Kelleher issued an Order Granting in Part and Denying in Part Defendants' Motions for Summary

---

**2.** UMG, Panzer and UMVD will hereinafter be referred to collectively as the "Universal Defendants."

**3.** Baller Blockin' was released only on DVD and home video (not in theaters). (FAC, ¶ 18.)

**4.** Plaintiff also filed suit against Defendants Gary Huckaby and Elston Howard. Plaintiff voluntarily dismissed all claims against them on March 5, 2002.

**5.** The FAC added Cash Money Films, Inc. as a defendant.

Judgment. He entered judgment in favor of Defendants regarding Plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, intentional and negligent interference with prospective economic advantage and tortious interference with contractual relations. With respect to Plaintiff's copyright infringement claim, the Court held that the undisputed facts could support a finding that Plaintiff impliedly granted Cash Money a non-exclusive license to use his Narration Script. The Court further reasoned that Plaintiff revoked this implied license upon filing of the instant action.[6] While Defendants, as non-exclusive licensees, could not be held liable for copyright infringement prior to the filing of the suit, the Court held that a triable issue remained as to whether Defendants are liable for copyright infringement since the filing of this lawsuit in April 2001. On balance, therefore, Plaintiff's Lanham Act and Copyright claims for relief survived.[7]

On November 18, 2002, the Cash Money Defendants filed a Motion in Limine to Exclude All Argument and Evidence of Alleged Copyright Infringement of Narration Script or Alternatively for Partial Summary Judgment on First Claim for Copyright Infringement and Third Claim for Declaratory Relief. On this same date, the Universal Defendants filed a Joinder in this Motion.

On January 28, 2003, Judge Kelleher issued an Order Denying Plaintiff's Motion in Limine to Exclude Defendants' Evidence for Panzer's Notes and Screenplay.

On March 4, 2003, Judge Kelleher issued an Order Denying Defendants' Motion for Summary Judgment on First Claim for Copyright Infringement and Third Claim for Declaratory Relief.

On March 7, 2003, this case was reassigned to this Court.

On July 7, 2003, Defendants filed a Motion for Reconsideration, which is currently before this Court. Also before this Court is the Pretrial Conference and Jury Trial Setting.

## II. *Discussion*

### A. *Standard*

Under Local Rule 7–18, this Court is empowered to reconsider decisions on prior motions. Local Rule 7–18 specifically provides that:

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

### B. *Analysis*

Defendants seek reconsideration in part of the July Order dismissing in part Plaintiff's Second Claim for Relief for violation of the Lanham Act. They assert "(a) a material difference in fact or law from that presented to the Court before such decision in that the exercise of reasonable

---

6. The Court disposed of Defendants' claim that Plaintiff was estopped from asserting any copyright interest in the Narration Script.

7. The July Order addressing the Lanham Act cause of action is explained in the Analysis portion of this Order.

diligence could not have been known to the party moving for reconsideration at the time of such decision," and "(b) the emergence of new material facts or a change of law occurring after the time of such decision." Specifically, after the issuance of July Order, the United States Supreme Court issued its opinion in *Dastar v. Twentieth Century Fox*, —— U.S. ——, 123 S.Ct. 2041, 156 L.Ed.2d 18 (June 2, 2003), and Defendants claim that *Dastar* bars Plaintiff's Lanham Act claim as a matter of law.

### 1. The July Order

Under the Lanham Act, Plaintiff alleges that Defendants engaged in unfair trade practices and unfair competition for appropriating his "copyrighted Narration Script, re-sequencing of scenes and re-scoring of musical content[.]" (*See* FAC, ¶ 44.) Specifically, Plaintiff alleges "reverse passing off" based on Defendants' misattribution of film credits for authorship and direction of Baller Blockin' solely to Robert and Bryan Williams. (*See id.* at ¶ 45.)

In the July Order, the Court explained that Section 43(a) of the Lanham Act reaches " 'reverse passing off,' which occurs when a person removes or obliterates the original trademark, without authorization, before reselling goods produced by someone else." July Order, p. 11 (quoting *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir.1981)). It further explained that " 'mere omission' " of credit, "which obscures the contribution of another to the final product," is actionable under this theory. *Id.* (quoting *Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1407 (9th Cir.1988)). The Court, acknowledging that the Lanham Act does not create a right of express attribution (*see Cleary v. News Corp.*, 30 F.3d 1255, 1260 (9th Cir.1994)), held that to recover on his Lanham Act claim, Plaintiff must demonstrate that his alleged contributions in writing the Narration Script and re-editing and re-scoring the film were partially or wholly attributed

to others. *See id.* at p. 12. In other words, Plaintiff cannot seek a remedy under the Lanham Act for credit for contributions not attributed to others. The Court concluded as follows:

> The only potentially relevant credit given in the film and on its packaging is that given for "story/screenplay" and "editing." ... A triable issue of fact exists as to whether Plaintiff's alleged contributions fall within the categories of "story/screenplay" and "editing" such that failure to include Plaintiff's name in the credits constitutes misattribution under the Lanham Act. Therefore, insofar as Plaintiff can show that his alleged contributions fall within the identified credits, his claim survives.

*Id.* at pp. 12–13.

### 2. The Supreme Court's opinion in *Dastar*

In *Dastar*, plaintiff Twentieth Century Fox ("Fox") produced a 26–episode television series called "Crusade in Europe," which initially aired in 1949, featuring military film footage. 123 S.Ct. at 2044. The copyright on the series expired in 1977, leaving the series in the public domain. *Id.* Fox later granted to co-plaintiffs SFM Entertainment ("SFM") and New Line Home Video ("New Line") the exclusive right to sell the "Crusade" series on video. *Id.*

Defendant Dastar sought to compete directly with the SFM and New Line videos by purchasing tapes of the original "Crusade" series and copying and editing them—retaining much of the original series by adding new opening and closing sequences, credits, chapter-title sequences, and narrated introductions, and making a few other cosmetic changes. *Id.* Dastar also created new packaging and a new title, selling its version as "World War II Campaigns in Europe." *Id.* Dastar's "Cam-

paigns" videos omitted any reference to the "Crusade" series, Fox, New Line, or SFM, and instead stated that the "Campaigns" videos were "Produced and Distributed by: *Entertainment Distributing* " (a company owned by Dastar) and "Present[ed]" by Dastar, and listed Dastar employees as the executive producer, producer and associated producer of the series. *Id.*

Fox, SFM and New Line asserted a Lanham Act claim against Dastar on the basis that "Dastar's sale of Campaigns 'without proper credit' to the Crusade television series constitutes 'reverse passing off' in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ....." [8] *Id.*, 123 S.Ct. at 2044–45. The District Court granted summary judgment for the plaintiffs. *Id.*, 123 S.Ct. at 2045.[9] The Ninth Circuit affirmed, finding that Dastar had engaged in an actionable "bodily appropriation" because it copied "substantially the entire Crusade in Europe series created by Twentieth Century Fox, labeled the resulting product with a different name and marketed it without attribution to Fox." *Twentieth Century Fox Film Corp. v. Entertainment Distributing*, 34 Fed. Appx. 312, 314 (9th Cir.2002). It concluded that such conduct established reverse passing off. *Id.*

The Supreme Court reversed. It acknowledged that the plaintiffs' claim would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own. 123 S.Ct. at 2046. This is because "origin" would refer to the manufacturer or producer of the physical goods that are made available to the public—the videotapes. However, it stated that Dastar's alleged wrongdoing is "vastly different" in that it took a creative work in the public domain—the Crusade television series—copied it, made minor modifications and produced its very own series of videotapes. *Id.*, 123 S.Ct. at 2047. Under this scenario, if "origin" includes the creator of the underlying work that Dastar copied, then someone else was the origin of Dastar's product. The Supreme Court then determined that the most natural understanding of the "origin" of "goods" is the producer of the tangible product sold in the marketplace (i.e., the videotapes sold by Dastar). *Id.* It stated that the phrase "origin of goods" in the Lanham Act is "incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.*

The Court then examined the argument that communicative products—products that are valued not primarily for its physical qualities but for the intellectual content that it conveys such as a book or video—should be accorded special treatment. In other words, for a communicative product,

---

8. Section 43(a) of the Lanham Act provides: Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which—
   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities of another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1).

9. Interestingly, this Court was the District Court first assigned the *Dastar* case, and then the case was randomly reassigned to Judge Cooper upon her appointment to the District Court.

"origin of goods" must be deemed to include not merely the producer of the physical item (the video producer Dastar) but also the creator of the content that the physical item conveys (assertedly, the plaintiffs). The Supreme Court rejected this and found that the "problem with this argument . . . is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." *Id.*, 123 S.Ct. at 2048. It explained as follows:

> Federal trademark law has no necessary relation to invention or discovery, (citation omitted), but rather, by preventing competitors from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, and helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product, (citation omitted). Assuming for the sake of argument that Dastar's representation of itself as the "Producer" of its videos amounted to a representation that it originated the creative work conveyed by the videos, allowing a cause of action under s 43(a) for that representation would create a species of mutant copyright law that limits the public's "federal right to copy and to use" expired copyrights (citation omitted).

*Id.* (internal quotation marks omitted). The Court noted the serious practical problems of defining "origin" to require attribution of uncopyrighted materials. It "d[id] not think the Lanham Act requires this search for the source of the Nile and all its tributaries." *Id.*, 123 S.Ct. at 2049.

The Supreme Court then concluded as follows:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods. . . . To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do. (Citation omitted.)

*Id.*, 123 S.Ct. at 2050. (Emphasis in original.)

### 3. *Dastar* precludes Plaintiff's Lanham Act claim

■ Defendants argue that *Dastar* invalidates Plaintiff's Lanham Act claim. This Court agrees with Defendants. As narrowed in the July Order, Plaintiff's Lanham Act claim is based on the misattribution of credits for "story/screenplay" and "editing" on the Baller Blockin' film. Plaintiff alleges that he should be given credit for "the authoring of the 'Narration Script' . . ., editing film sequences and rescoring the music." Under *Dastar*, however, the Supreme Court specifically held that the phrase "origin of goods" "refers to the producer of tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.*, 123 S.Ct. at 2050 (emphasis added). As such, Plaintiff would have a claim if Defendants purchased copies of Plaintiff's goods (i.e. the film) and repackaged them as their own. By contrast, Plaintiff does not have a claim for his authorship and direction embodied in that film. His claim, therefore, is barred as a matter of law.

In his Opposition, Plaintiff argues that *Dastar* is not a broad sweeping dismissal of reverse passing off claims but rather is limited to defining "origin of goods," not the origin of services. He claims that the Supreme Court's sole focus was on the

term "origin of goods," and that it did not address the origin of services, which is at issue here. This Court disagrees with Plaintiff. As Defendants assert, the Supreme Court in *Dastar* was concerned with a claim materially identical to Plaintiff's claim here. The claim was that Dastar had made false or misleading representations on its own goods (Dastar's Campaigns videotapes)—just as Plaintiff here claims that Defendants made false or misleading representations on Defendants' own goods (the Baller Blockin' video and DVD). The "goods" are the defendants', not the plaintiff's. *Dastar* makes clear that a claim that a defendant's failure to credit the plaintiff on the defendant's goods is actionable only where the defendant literally repackages the plaintiff's goods and sells them as the defendant's own—not where, as here, Defendants are accused only of failing to identify someone who contributed not goods, but ideas or communications (or, for that matter, "services") to Defendants' product. *See* 123 S.Ct. at 2047 ("[A]s used in the Lanham Act, the phrase 'origin of goods' is in our view incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain.").[10]

Plaintiff contends that his claim survives *Dastar* because he provided "services" as opposed to "goods." However, to the contrary, his claim fails for this reason. All he allegedly provided was "services," rather than goods which Defendants repackaged and resold as their own. *See id.*, 123 S.Ct. at 2046 (Plaintiff's claim "would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own."). Indeed, in *Dastar*, the defendant

did exactly what Plaintiff accuses Defendants of doing here—attributing to itself and its employees various "services" that the plaintiffs claimed they, in fact, provided on the defendant's videotapes. *See id.*, 123 S.Ct. at 2044 ("The advertising states: 'Produced and Distributed by: Entertainment Distributing' (which is owned by Dastar) ... Similarly, the screen credits state 'DASTAR CORP presents' and 'an ENTERTAINMENT DISTRIBUTING Production,' and list as executive producer, producer, and associate producer, employees of Dastar."). The Supreme Court held that the plaintiffs' claim that these credits were misleading because the plaintiffs really provided those services was nonactionable. As Defendants state, Plaintiff's attempt to differentiate the "services" of an "executive producer" or "producer" at issue in *Dastar* from his alleged "services" as an "editor" and "writer" is a distinction without a difference.

Plaintiff then asserts that "[i]f defendants [sic] argument were accepted, a talented director who directs a Summer blockbuster for example can be deprived of the immense value of such a credit in the entertainment industry, simply because the producer decides to name himself as the director .... A reading that the Lanham Act does not protect those people who provide services on films permits a form of anarchy in the entertainment industry, where anybody could be credited for anyone else's work and have their credit obliterated." However, the Supreme Court directly addressed Plaintiff's assertion. "The problem with this argument according special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically." *Id.*,

---

**10.** Contrary to Plaintiff's argument, based on the *Dastar* Court's holding, the Ninth Circuit cases cited by Plaintiff would be overruled to the extent they find a reverse passing off claim based on the failure to credit the author of any idea, concept or communication embodied in the tangible goods.

123 S.Ct. at 2048. In Plaintiff's hypothetical, the director has options to protect his interest—obtaining a contractual right to a credit, relying on the regulation of credits in union collective bargaining agreements (e.g., the Directors Guild) or maintaining the copyright in the film. In light of *Dastar*, this hypothetical director cannot bring a claim under the Lanham Act.[11]

Finally, Plaintiff attempts to distinguish *Dastar* by claiming that "[t]he Court focused its analysis of the case on the concept that the involved works were uncopyrighted and the difficulties associated with the origin of the product." To the contrary, the Supreme Court's holding did not depend on whether the works were copyrighted or not. While the film footage at issue in *Dastar* was not copyrighted at the time of distribution by Dastar, the Court's holding is in no way limited to uncopyrighted material. Rather, in being careful not to extend trademark protections, the Court noted that protection for communicative products was available through copyright claims. In fact, this protection would only be available if a valid copyright existed. Indeed, the Court stated:

> The creative talent of the sort that lay behind the Campaigns videos is not left

without protection. The original film footage used in the Crusade television series could have been copyrighted, . . ., as was copyrighted (as a compilation) the Crusade television series, even though it included material from the public domain, . . . . Had Fox renewed the copyright in the Crusade television series, it would have had an easy claim of copyright infringement.

*Id.*, 123 S.Ct. at 2050.

Here, Plaintiff does have a copyright claim. As was set forth in the July Order, "a triable issue of fact exists as to whether Defendants are liable for copyright infringement since the filing of this law suit [sic] in April 2001." (July Order, p. 10.)[12] As *Dastar* makes clear, Plaintiff's claim is more appropriately addressed under copyright law rather than under the Lanham Act. Therefore, this Court concludes that Defendants are the "origin" of the Baller Blockin' film insofar as that term is used to define the manufacturer or producer of the physical goods that were made available to the public, and no Lanham Act liability attaches to them. Plaintiff's claim under the Lanham Act fails as a matter of law, and Defendants are entitled to summary judgment with respect to the claim.[13]

---

**11.** The Supreme Court also recognized that extending a special definition of "origin" for producers of communicative products (like Defendants here who produced a movie) "places the manufacturers of those products in a difficult position. On the one hand, they would face Lanham Act liability for failing to credit the creator of a work on which their lawful copies are based; and on the other hand they could face Lanham Act liability if that should be regarded as implying the creator's 'sponsorship or approval' of the copy . . . ." *Id.*, 123 S.Ct. at 2049.

**12.** Judge Kelleher found that existence of an implied license for Defendants to use the narration script, and that said license was revoked by the filing of the lawsuit. He therefore concluded that Defendants cannot be held liable for copyright infringement of the

Narration Script to the extent the infringing acts occurred prior to the filing of this suit. (*See* July Order, p. 10.)

**13.** Plaintiff also argues that Defendants' motion is improperly made because it has been made well after all filing deadlines and there is no exception for a motion for reconsideration. Specifically, he relies on Federal Rule of Civil Procedure 16(b), which provides that a scheduling order shall not be modified except by leave of court and upon showing of good cause. Local Rule 7–18 provides for no time limitation for a motion for reconsideration. Nonetheless, assuming this motion would be subject to Rule 16, Defendants have shown good cause to modify the Scheduling Order to allow this Motion to be heard—a recent Supreme Court decision which renders a claim set for trial invalid.

#### 4. Plaintiff's request for leave to amend is denied

Plaintiff argues that in pleading a cause of action for Lanham Act violation, he properly relied on existing law. He states that rather than plead duplicative claims for relief, he opted for the federal Lanham Act claim rather than the statutory unfair business practice and deceptive advertising claims. Plaintiff claims that he should be permitted to amend his complaint to plead a claim for relief based on statutory unfair business practices, California Business & Professions Code §§ 17200 et seq. Defendants respond that amendment at this stage is too late and would be futile.

At the outset, this Court notes that Plaintiff does not properly move this Court for leave to amend pursuant to Federal Rule of Civil Procedure 15. Nonetheless, even if Plaintiff properly followed procedure, this Court finds that leave to amend is not warranted. First, "late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Acri v. Int'l Ass'n of Machinists and Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir.1986). Plaintiff admittedly knew of the facts and this particular theory, but instead he "opted for the federal Lanham Act claim, over the statutory unfair business practice and deceptive advertising claim." Second, Defendants' claim of prejudice has merit. Passage of the discovery cut-off date and an imminent trial date constitutes prejudice. *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 809 (9th Cir.1988). Finally, this Court agrees with Defendants that Plaintiff's desired statutory unfair business practice claim would be futile. The Ninth Circuit has consistently held that state law unfair competition claims are "congruent" with Lanham Act claims; Plaintiff's putative unfair competition claim would fail for the same reasons his Lanham Act claim fails. *Rice v. Fox*, 330 F.3d 1170, 1181 (9th Cir.2003); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994).

#### 5. Plaintiff's request for reconsideration is denied

Plaintiff asks this Court to "take the opportunity to reconsider the summary adjudication order on the copyright claim and the claim for intentional interference with prospective economic advantage." Plaintiff offers no basis for reconsideration. Indeed, he admits that "[w]hile Plaintiff did not believe a motion for reconsideration would have been proper pursuant to CD CA Rules 7–17 and 7–18, it appears clear that Judge Kelleher's rulings with respect to Plaintiff's copyright infringement claim and his intentional interference with prospective economic advantage claim, were erroneous."

Thus, Plaintiff simply disagrees with Judge Kelleher's rulings which were adverse to him, and he asks this Court to consider the identical facts and law upon which Judge Kelleher already ruled. This Court finds that Plaintiff's request is improper and unwarranted under the applicable rules. As such, this Court denies Plaintiff's request.

### C. *Conclusion*

Accordingly, this Court **grants** Defendants Cash Money Records, Inc., Ronald Williams, Bryan Williams, UMG Recordings, Inc., Universal Music & Video Distribution Corp. and Jeffrey Panzer's Motion for Reconsideration and **dismisses** Plaintiff's Second Claim for Relief for violation of the Lanham Act.

IT IS SO ORDERED.