In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2256

M. ARTHUR GENSLER JR. & ASSOCIATES, INC.,

*Plaintiff-Appellant*,

*v.*

JAY MARSHALL STRABALA,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 3945 — **Ronald A. Guzmán**, *Judge*.

ARGUED SEPTEMBER 12, 2013 — DECIDED AUGUST 21, 2014

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. After leaving Gensler, an architectural firm with projects throughout the world, where he had been a Design Director, Jay Marshall Strabala opened his own firm, 2Define Architecture. Strabala stated on its web site (http://www.define-arch.com/en/featured), on his personal Flickr site, or both, that he had designed five projects for which Gensler is the architect of record: Shanghai Tower, Hess Tower, Three Eldridge Place, the Houston Bal-

let Center for Dance, and the headquarters of Tesoro Corpo-
ration. Gensler contends that Strabala's statements, a form of
"reverse passing off" in the argot of this field, violate §43(a)
of the Lanham Act, 15 U.S.C. §1125(a). But the district judge
dismissed the complaint, ruling that, because Strabala did
not say that he built or sold these structures, he could not
have violated §43(a). 2012 U.S. Dist. LEXIS 21255 (N.D. Ill.
Feb. 21, 2012). The court then dismissed Gensler's state-law
claims, relying on its concession that the outcome of its fed-
eral-law claim controls the whole suit. 2012 U.S. Dist. LEXIS
21255 at *8–9.

The district court read *Dastar Corp. v. Twentieth Century
Fox Film Corp.*, 539 U.S. 23 (2003), to limit §43(a) to false des-
ignations of goods' origin—and since Gensler's claim con-
cerns services rather than goods, the court held that Gensler
cannot invoke the Lanham Act. That conclusion misreads
*Dastar*. True enough, it held that the absence of a false or
misleading designation of goods' origin nixed a Lanham Act
claim, but that was because the suit involved only goods.
The Supreme Court did not read "services" out of the Lan-
ham Act. Nor did it hold that a false claim of origin is the
only way to violate §43(a). If it had done that, then *POM
Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014), could
not have come out as it did, for there was no dispute about
who made what, as opposed to whether one seller was try-
ing to deceive consumers about what its product contained.

*Dastar* held that a copyright can't be extended by using
the Lanham Act. Dastar, the defendant, copied and sold
some videos after the copyright expired. Dastar correctly
identified itself as the producer of the physical objects that
embodied the intellectual property; doing so satisfied both

statutes, the Court held. Twentieth Century Fox, which had owned the copyright before its expiration, did not contend that Dastar had falsely identified itself as the videos' creator, wrongly imputed the newly made copies to Twentieth Century Fox, or made any other false claim. Because the origin of goods had been correctly designated, and no false statement made, the Court held that §43(a) did not supply a claim for relief. Gensler, by contrast, does assert there has been a false claim of origin—though of services rather than goods. Gensler maintains that Strabala falsely claims to have been the creator of intellectual property (the designs of the five buildings). Architects' success in winning clients depends on what they have accomplished; Gensler has a strong interest in defending its reputation for creativity and preventing a false claim that someone else did the design work.

Section 43(a)(1) reads:

> Any person who, on or in connection with any goods or services, … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person [shall be liable in a civil action.]

Gensler contends that Strabala made a "false or misleading representation of fact" (his role in designing the five buildings) that is "likely to … deceive as to the … connection[] or association of such person [Strabala] with another person [Gensler]" and to deceive clients about the "origin" of the designs. Nothing in *Dastar* forecloses such a claim. See *So-*

*ciete des Hotels Meridien v. LaSalle Hotel Operating Partnership, LP*, 380 F.3d 126 (2d Cir. 2004). The district court thought that Gensler should have relied on copyright law rather than the Lanham Act, but Strabala did not make or sell copies of any plans or drawings in which Gensler claims a copyright. A false claim of authorship, without the making of copies (or some other act covered by 17 U.S.C. §106), is outside the scope of copyright law. Gensler's only plausible federal claim rests on §43(a).

The question remains, however, whether Gensler has a tenable claim. It charges Strabala with a form of fraud, so we would expect its complaint to allege with particularity the nature of the grievance—what Strabala said and why it is false. See Fed. R. Civ. P. 9(b). Yet the complaint contains only a few quotations and does little to explain what part of each is false. For example, it quotes this from Strabala's Flickr site: "Shanghai Tower was designed by American architect Marshall Strabala." But it does not say why the statement that he "designed" the building is false.

We can think of three ways in which an architect's assertion that he designed a building could be false:

- The architect did not have anything to do with the design, never having worked on the project.

- The architect worked on the project but overstated his role. For example, the architect may have designed some of a building's details, but not its basic appearance or attributes.

- The architect worked on the project and contributed some or even all important features, but the project

was so complex that no one person bore full respon-
sibility.

The first of these would be like Strabala claiming to have di-
rected the motion picture *Casablanca*. The second would be
like a junior associate, who did some research but contribut-
ed only a few pages of text, claiming to have been the author
of Arnold, Fortas & Porter's brief in *Gideon v. Wainwright*.
Frank Lloyd Wright was accused of overstating his role at
Adler & Sullivan in this way, in order to get commissions
after he set up his own practice in 1893.

Gensler's complaint does not contend that Strabala's
statements are false or misleading in either of these ways.
Instead Gensler appears to rely on the third possibility: that
big buildings are team jobs that *no one* designs. The com-
plaint alleges, for example: "The Gensler team that designed
the Shanghai Tower included approximately one hundred
people who devoted significant time to the project. [Strabala]
was one of many members of that Gensler team. Gensler, not
[Strabala], is the source of the architectural and design ser-
vices rendered in designing the Shanghai Tower." It is as if
Warner Bros. wanted Michael Curtiz, who directed *Casablan-
ca*, to keep silent about his role because the film could not
have succeeded without Humphrey Bogart's and Ingrid
Bergman's acting, Max Steiner's music, Arthur Edeson's cin-
ematography, Murray Burnett's and Joan Alison's play, Jul-
ius and Philip Epstein's screenplay, and the contributions of
a hundred others—or at least to append to any claim of di-
rectorship something along the lines of "many persons in
addition to directors bear credit for a film's success or blame
for its failure." As Gensler sees it, the auteur approach to

filmmaking is legally impermissible in the architectural business.

Yet if the gist of Gensler's complaint is that big projects require big teams—and that Gensler insists on institutional rather than personal credit—where's the falsity? If Strabala (like Frank Lloyd Wright during much of his career) designed houses for unsophisticated clients, then Gensler might have a point, though it would have trouble proving damages. (Gensler does not allege that it designs houses or other small projects, so it could not be injured by a stratagem that boosted Strabala in the eyes of naïve clients.) But as far as we can see, from the parties' web sites as well as the complaint, both Gensler and 2Define specialize in large projects, which have sophisticated clients—may indeed have in-house architects to oversee the hiring and work of firms such as Gensler and 2Define, just as large businesses have in-house counsel to oversee legal projects. Gensler's complaint observes that 2Define describes itself as "specializ[ing] in complex high profile projects", which is how Gensler describes its own business. People who pay millions for substantial projects (Shanghai Tower will cost more than $4 billion by the time it is finished in 2015) know full well that it takes an architectural team to design and execute the plans. They also know that teams have leaders—and Gensler has not alleged that Strabala said anything false by implying that he was the (or a) leader of the teams on these five projects.

If sophisticated clients would not be misled, then this suit represents an effort by Gensler to conceal the fact that a designer of Shanghai Tower (and other big projects) has flown the coop. That fact is known, to be sure, but if Gensler wins this case other architects who leave will be required to keep

mum about their accomplishments—and then it will be Gensler, not the departing architect, that is in a position to make a misleading presentation to a future client. If only "Gensler" and not any real person designs a building, the firm can never suffer from the departure of talented designers, because Gensler the corporation remains. Alternatively the suit could be understood as an effort to impair competition by imposing costs on a departing architect, even though setting up a new firm does not violate any contract (and the old employer does not allege a theft of trade secrets). New competition by people who leave large firms to set up small rivals is beneficial for consumers.

These considerations make it tempting to affirm the district court's judgment, though not for the district court's reasons. Yet Strabala has not asked us to take that course. His brief defends the district court's reasoning and does not ask us to affirm on a different ground. It does not invoke Rule 9(b) or contend that sophisticated clients understand that no single architect is the sole designer of a monster project such as Shanghai Tower. The district court dismissed the complaint under Rule 12(b)(6), and we do not think that Gensler has pleaded itself out of court just by alleging that Strabala tries to attract sophisticated customers for large projects. At least for now, Strabala is not arguing that any of Gensler's allegations, or the suggestion that sophisticated clients might think Strabala the *sole* designer of a billion-dollar building, is implausible as *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), use that term. Nor does Gensler's complaint rule out the possibility that it competes with Strabala to build some smaller projects with less sophisticated clients. We have explained why the complaint's legal theory is tenable, and the possibility that it

might fail on the facts does not authorize a court of appeals to dismiss a suit before the parties have joined issue on vital topics.

The judgment is vacated, and the case is remanded for proceedings consistent with this opinion.