RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0484p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GNESYS, INC.,

        *Plaintiff-Appellee,*

    *v.*

BOYD B. GREENE, Individually, and d/b/a GREENE &
ASSOCIATES, and GREENE & ASSOCIATES, LLC,
        *Defendants-Appellants.*

No. 04-6048

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-02659—Jon Phipps McCalla, District Judge.

Argued: October 26, 2005

Decided and Filed: December 22, 2005

Before: KEITH and BATCHELDER, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** John J. Mulrooney, CRONE & MASON, Memphis, Tennessee, for Appellants. Grady
M. Garrison, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, Memphis, Tennessee, for
Appellee. **ON BRIEF:** John J. Mulrooney, CRONE & MASON, Memphis, Tennessee, for
Appellants. Grady M. Garrison, Charles C. Harrell, Elizabeth Einstman Chance, BUTLER, SNOW,
O'MARA, STEVENS & CANNADA, Memphis, Tennessee, for Appellee.

---

## OPINION

---

      OBERDORFER, District Judge. This is an appeal from the district court's decision finding
Defendant-Appellant Boyd B. Greene in contempt for violating its order enjoining him from using
the intellectual property of his former employer, Gnesys, Inc. It found that Greene had illegally used
confidential and proprietary information regarding Gnesys's products in marketing his own product
overseas. The central issue on appeal is whether Greene timely appealed the district court's orders
finding him in contempt and directing him to pay compensatory damages. We conclude that he did
not, and accordingly we dismiss the appeal of the district court's ruling on these two substantive

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by
designation.

issues. However, we affirm the district court's finding that Greene willfully violated the Injunction and its consequent award of attorney's fees to Gnesys.

## I.        Background and Procedural History.

Gnesys manufactures and sells the HYDRASEP Oil Water Separator, a device that separates oil from water. Until he left the company because of a salary dispute, Greene had served Gnesys in several positions over the years: shareholder of Gnesys from mid-1993 to August 22, 2000; employee and officer until his resignation on May 4, 1998; and a member of the Board of Directors until he resigned that position on April 28, 1999.

On August 2, 1999, Gnesys sued Greene in federal court. Gnesys alleged that Greene's unauthorized use of Gnesys's intellectual property constituted unfair competition and violated state tort law. According to Gnesys, after Greene left the company, it discovered that Greene sought to obtain patent rights in India for Greene's own StakPak product, and distributed to potential investors in the United States and China StakPak business plans which contained information he knew to be the confidential and proprietary information of Gnesys. He also allegedly used photographs of the HYDRASEP device in promotional materials for the StakPak (albeit with the Gnesys logo digitally removed), and used product specifications for the StakPak that were almost verbatim the same as Gnesys's specifications for the HYDRASEP device.

On October 26, 1999, pursuant to a settlement agreement, the district court entered a Consent Preliminary Injunction, which ordered Greene to stop using Gnesys's intellectual property and infringing its patents related to its HYDRASEP device. On August 22, 2000, the court entered a Consent Permanent Injunction and Final Judgment ("Injunction") to the same effect.

In April 2001, Gnesys moved the court to cite Greene for contempt. The motion alleged six separate violations of the Injunction, primarily related to Greene's continued unauthorized use of Gnesys's confidential and proprietary information to market his StakPak device. Gnesys also sought compensatory damages, expenses, and attorney's fees.

The district court found that Greene willfully violated four provisions of the Injunction and consequently was in contempt. The court accordingly directed Gnesys to submit evidence that would support an award of damages, "either compensatory or punitive." *See* Contempt Order (Nov. 26, 2002) (J.A. 63), at 20. After receiving briefing from the parties, the court awarded Gnesys $100,000 in damages, and ordered Greene to post a $25,000 bond pending rescission of the patent application in India. *See* Damages Order (Aug. 26, 2003) (J.A. 101), at 6. After additional briefing, the court also directed Greene to reimburse Gnesys $158,041.50 for attorney's fees and $8,774.40 in costs that he had caused Gnesys to incur. *See* Attorney Fees Order (July 21, 2004) (J.A. 199), at 1-2. On August 20, 2004, Greene appealed all three orders.

## II.       Timeliness of Appeal.

Before reaching the merits of the district court's decision, we consider whether Greene timely appealed the orders finding him in contempt and awarding Gnesys compensatory damages.

A party must file a notice of appeal with the district court "within 30 days after the judgment or order appealed from is entered." Fed. R. App. P. 4(a)(1)(A). The judgment must be a "final decision" of the lower court. 28 U.S.C. § 1291. "'A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988) (citation omitted).

In this case, the district court issued its Contempt Order on November 26, 2002; its Damages Order on August 26, 2003; and its Attorney Fees Order on July 21, 2004. Greene filed a Notice of Appeal on August 20, 2004, within 30 days of the filing of the Attorney Fees Order, but almost a year after the entry of the Damages Order. Gnesys contends that the Damages Order was a "final decision" on the discrete issues of contempt and compensatory damages. Therefore, it urges that the August 20, 2004 Notice of Appeal was not timely, because it was filed more than 30 days after issuance of the lower court's "final decision" of August 26, 2003.

Greene responds that the attorney's fees award was part of the merits decision and was intertwined with the damages assessment. As a result, he contends, the August 2003 Damages Order was not a final judgment, because an essential element of the damages award remained unresolved, so that the contempt judgment is appealable.

In *Budinich*, the Supreme Court held that the district court's decision denying petitioner's new trial motion was final and appealable even when the court had not yet awarded attorney's fees. There petitioner sued pursuant to a Colorado statute to collect employment compensation that respondent owed him. A jury awarded petitioner only $5,000, and petitioner timely moved for a new trial and attorney's fees. On May 14, 1984, the *Budinich* court denied the new trial motions, found that petitioner was entitled to attorney's fees, and ordered further briefing on the proper amount. On August 1, 1984, the trial court issued its "final order" concerning attorney's fees. On August 29, 1984, petitioner filed its Notice of Appeal, which purported to cover all of the post-trial orders. *See* 486 U.S. at 197-98. Respondent moved to dismiss the appeal as untimely, arguing that the May 14 ruling was a final judgment. The Tenth Circuit agreed and granted the motion to dismiss as to all issues except the attorney's fees, which it affirmed on the merits.

The question thus presented to the Supreme Court on appeal was "whether a decision on the merits is a 'final decision' . . . when the recoverability or amount of attorney's fees for the litigation remains to be determined." *Id.* at 199. The Court unanimously held that the district court's May 1984 order was a final decision. It reasoned that "[a] question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order." *Id.* (citations omitted). As the Court previously held in another case involving a 42 U.S.C. § 1988 claim, a request for attorney's fees is not a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) because it does not seek "'reconsideration of matters properly encompassed in a decision on the merits. . . . [A] request for attorney's fees under § 1988 raises legal issues collateral to' and 'separate from' the decision on the merits." *Id.* at 200 (quoting *White v. N.H. Dep't of Empl. Sec.*, 455 U.S. 445, 451-52 (1982)).

Finally, the Court held that "[a]s a general matter . . . we think it indisputable that a claim for attorney's fees is not part of the merits of the action to which the fees pertain. Such an award does not remedy the injury giving rise to the action, and indeed is often available to the party defending against the action." *Id.*

The Colorado statute at issue in *Budinich* provided that, in a suit to collect compensation due from employment, "the judgment shall include a reasonable attorney fee in favor of the winning party, to be taxed as part of the costs of the action." Colo. Rev. Stat. 8-4-114 (1986). The *Budinich* petitioner argued that there must be an exception to the general rule when the statute itself appears to make attorney's fees part of the merits question. The Court rejected this argument. It held that a determination as to whether a decision is "final" "should not turn upon the characterization of those fees by the statute or decisional law that authorizes them." *Budinich*, 486 U.S. at 201.

In reaching this conclusion, the Court cited to the need for the judicial system to function smoothly and the need for a uniform rule, even when an attorney's fee provision appears to be more of a "merits" issue. As the Court stated,

what is of importance here is not preservation of conceptual consistency in the statute of a particular fee authorization as "merits" or "nonmerits," but rather preservation of operational consistency and predictability in the overall application of § 1291. *This requires, we think, a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.*

*Id.* at 202 (emphasis added); *see also Morgan v. Union Metal Mfg.*, 757 F.2d 792, 794 (6th Cir. 1985) ("We ally ourselves with those circuits which have held that a judgment is final for purposes of appeal although the amount of attorney fees have not been determined.") (citation omitted). Lastly, the Court also held that "[t]he time of appealability, having jurisdictional consequences, should above all be clear. . . . Courts and litigants are best served by the bright-line rule[.]" *Budinich*, 486 U.S. at 202.

On appeal, Greene offers two arguments in an attempt to distinguish *Budinich*. First, pointing to the fact that the Injunction was a product of a settlement agreement as distinguished from an adjudication, he argues that Gnesys is not entitled to attorney's fees because the court's finding of contempt was not a "merits" decision that disposed of the complaint. This argument is unpersuasive. There is no meaningful distinction for these purposes between a complaint that is resolved on the merits, and a complaint that leads to a consent injunction which is subsequently violated. To find otherwise would mean that a decision finding a party in contempt of an injunction as part of a settlement would not be appealable at all. Greene's argument is also contrary to prevailing caselaw, which routinely allows direct appeal from a contempt citation. *See, e.g.*, *Peabody Coal Co. v. Local Union Nos. 1734, 1508, and 1548*, 484 F.2d 78 (6th Cir. 1973) (rejecting appellee's argument that lower court's order holding appellant in contempt for violating injunction was not a "final judgment"); *see Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716 (6th Cir. 1996) (defendant appealed lower court's finding of contempt for violating a consent permanent injunction).

Second, Greene argues that the award of attorney's fees was part of the damages assessment, so that the initial decision fixing the compensatory damages was not a final decision. The clear message of *Budinich* is to the contrary: even when a statute provides that attorney's fees are part of the damages claim, an award of compensatory damages effectively renders the decision final.

*Budinich* compels the conclusion that Greene's appeal was not timely with respect to the district court's finding of contempt and its award of compensatory damages. Indeed, an untimely appeal deprives a court of jurisdiction to consider the matter; "[c]ompliance with [the notice of appeal] rule is a jurisdictional prerequisite which this court can neither waive nor extend." *United States v. Christunas*, 126 F.3d 765, 768 (6th Cir. 1997) (citations omitted).[1]

As *Budinich* held, and we reaffirm today, a decision awarding attorney's fees is not part of the merits for purposes of determining if the lower court issued a "final decision." This is so even if the attorney's fees are authorized by statute, and even if the attorney's fees are construed to be part of the damages or sanction awarded by the court. The primary interest in these matters is to draw a clear line. The alternative would be unnecessary confusion for parties and the courts alike, with the outcome turning on whether attorney's fees in a particular case were deemed part of the "merits." We accordingly dismiss the appeal from the lower court's decision finding Greene in contempt and awarding Gnesys $100,000 in damages.

---

[1] We note that the perfection of an appeal does not deprive the lower court of jurisdiction to award attorney's fees. *See Jankovich v. Bowen*, 868 F.2d 867, 871 (6th Cir. 1989) ("federal courts repeatedly have held that the filing of a notice of appeal in the underlying action does not affect the district court's jurisdiction to consider a post-judgment motion for attorneys fees.") (citation omitted).

### III.    Attorney's Fees.

We review a district court's award of attorneys' fees and expenses under 15 U.S.C. § 1117(a) for abuse of discretion.  *See Eagles, Ltd. v. Am. Eagle Found.* 356 F.3d 724, 728 (6th Cir. 2004) ("The district court's denial of attorney's fees under 15 U.S.C. § 1117(a) . . . is reviewed for abuse of discretion.") (citation omitted); *see also Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998) ("This court has held that, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, attorney's fees may be awarded in 'exceptional cases.'  Thus, we review a district court's decision to award attorney's fees under the Lanham Act in the same way as its decision to award attorney's fees under any discretionary provision; *i.e.*, for an abuse of discretion.") (citations omitted).  "An abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, . . . improperly applies the law, . . . [or] employs an erroneous legal standard." *Barner v. Pilkington*, 399 F.3d 745, 748 (6th Cir. 2005) (internal quotations and citation omitted).  This Circuit "has defined an abuse of discretion as a definite and firm conviction that the trial court committed a clear error of judgment." *Eagles*, 356 F.3d at 726 (internal quotations omitted).

#### A.    Waiver

Before reaching the merits, Greene faces a procedural obstacle.  He did not object in the district court to the appropriateness of the attorney's fees award; he only objected to the *amount* of fees and the market rate for attorney's fees in Memphis, Tennessee.  On appeal, however, he argues for the first time that *no* fees were justified.

The Sixth Circuit "generally . . . will not hear issues raised for the first time on appeal.  We will deviate from this rule only in exceptional circumstances, such as when following the rule would cause a miscarriage of justice, and particularly where the question is entirely legal and has been fully briefed by both parties." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657-58 (6th Cir. 1996) (citation omitted).

As explained below, an award of attorney's fees in this case would not be a miscarriage of justice.  Nor is the award of attorney's fees here a purely legal decision – the issue of whether Greene's violation was willful is a fact-based question.  In short, Greene waived his right to argue on appeal the appropriateness of any attorney's fees.

Even if Greene had not waived his right to appeal this issue, however, we conclude the district court's decision to award attorney's fees was not an abuse of discretion.

#### B.    Award of Attorney's Fees

On appeal, Greene contends that the attorney's fees award statute relied on by the district court, 15 U.S.C. § 1117(a), applies only to trademarks and is inapplicable here.  This argument is incorrect.  Section 1117(a) provides that, in "exceptional circumstances," a court may award attorney's fees for a violation of, *inter alia*, 15 U.S.C. § 1125(a) (also known as the Lanham Act).  That provision, in turn, concerns false representation by those engaged in commerce.  By the

statute's clear language,[2] it is not limited to trademark issues.  As the Supreme Court held in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003):

> While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, . . . 15 U.S.C. § 1125(a) is one of the few provisions that goes beyond trademark protection.  As originally enacted, [§ 1125(a)] created a federal remedy against a person who used in commerce either "a false designation of origin, or any false description or representation" in connection with "any goods or services."

*Id.* at 28-29 (quoting 60 Stat. 441).

The district court demonstrated how Greene violated the Injunction in four respects, and how he did so deliberately.  We agree.  Rather than detailing once again the minutiae, we attach as an appendix the district court's Contempt Order.

Most important for these purposes, the district court found that Greene violated Paragraph 4(e)(i) of the Injunction, which prohibited Greene from "using or causing to be used . . . any of [Gnesys'] names and marks . . . on signs, decals, or other manner of display or in any *promotional materials* . . . or from otherwise suggesting in any way that Defendants' products or services have been approved, endorsed, authorized or sponsored by or are in any way associated or connected with [Gnesys.]."  *See* Contempt Order at 4 (emphasis added).  The district court found that Greene violated this provision by using a picture of Gnesys's HYDRASEP device in marketing his StakPak product (with the Gnesys logo digitally removed) and by including a virtually verbatim description of the HYDRASEP device in Greene's description of his own product.  *See id.* at 17-18.  These district court findings fully support its conclusion that Greene used a "false description or representation" in marketing his product.  *Dastar*, 539 U.S. at 29 (citation omitted).

The foregoing considered, we are persuaded that Greene willfully disregarded the Injunction, and that the district court's decision to award attorney's fees was not an abuse of discretion.

## IV.  Conclusion.

The appeal of the district court's decision finding Greene in contempt and awarding compensatory damages is DISMISSED.  The district court's July 21, 2004 Order awarding Gnesys attorney's fees and costs is AFFIRMED.

---

[2]Section 1125(a) establishes liability for:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

<u>APPENDIX</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **GNESYS, INC.,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )          **No. 99-2659 Ml/Bre** |
| | ) |
| **BOYD B. GREENE, individually** | ) |
| **and d/b/a GREENE & ASSOCIATES** | ) |
| **and GREENE & ASSOCIATES, L.L.C.,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

**ORDER FINDING DEFENDANTS IN CONTEMPT OF COURT**

Before the Court is Plaintiff's Motion for Issuance of Order to Show Cause and for Judgment of Contempt filed on April 12, 2001. The Court held hearings on this motion on July 11-12, 2001. The Court held a status conference on the matter on September 25, 2002.

Finding that Defendant disclosed confidential and proprietary information belonging to Plaintiff, pursued commercial exploitation of Plaintiff's intellectual property, and induced, aided and abetted other persons to commit the acts enjoined, the Court finds Defendant in contempt.

**Facts and Procedural History**

Defendant Boyd B. Greene was a shareholder of Gnesys, Inc. from prior to July 1, 1993 through August 22, 2000. He was employed with Plaintiff until June 30, 1998. He resigned as an officer of Plaintiff on May 4, 1998 and resigned from the Gnesys Board of Directors on April 28, 1999.

Green & Associates and Green & Associates, LLP are the other defendants in the case. At the request of Gnesys, Defendant Green established Green & Associates, a non-profit business, to provide a forum to do work to comply with the requirements of the Tennessee Valley Authority ("TVA") for having manufacturing standardized plans to manufacture the equipment, the HYDRASEP, and other equipment. Greene & Associates, LLC was a prior company that existed that was Defendant Greene's personal company for his engineering services formed in July of 1998.[1] (Transcript, pg. 9, lines 7-11).

---

[1]Gnesys' name is Greene Nassif Environmental Systems, Inc.

Plaintiff Gnesys, Inc. owns U.S. Patent No. 5,266,191 for "Immiscible Liquids Separator Apparatus and Method" issued on November 30, 1993; U.S. Patent No. 5,433,845 issued on July 18, 1995 for "Flow Control Bypass Basin Apparatus;" and U.S. Patent No. 6,019,825 issued on February 1, 2000 for "Hydrocyclone Gas Separator." Plaintiff also owns trademarks HYDRASEP and HYDRAPASS for mechanisms that separate oil from water.

This case was originally filed on August 2, 1999 as a Complaint for Federal Unfair Competition and Pendent State Claims. On October 26, 1999, the Court entered a Consent Preliminary Injunction. The Court approved and entered the Consent Permanent Injunction and Final Judgment on August 22, 2000 ("Injunction").

Paragraph 4 of the Injunction states as follows:

Defendants, their officers, members, agents, servants and employees and those persons in active concert or participation with them who receive actual notice of this order be, and they hereby are, permanently enjoined from:

A. Directly or indirectly making, using, offering to sell or selling any products, process or services which infringe upon any of the patents identified herein above in Paragraph 2.

B. Directly or indirectly using, in any manner, or disclosing to any third party, the existence of contents of Plaintiff's pending patent applications identified herein above in Paragraph 2, or Plaintiff's trade secrets or proprietary information, namely, Plaintiff's confidential information and know-how related to its products and processes, including those for separating two immiscible liquids of different densities, such as oil and water, and for removing sediment therefrom.

C. Directly or indirectly claiming ownership of, or any right, privilege, or permission to use, any of the Gnesys Intellectual Property.

D. Directly or indirectly pursuing commercial exploitation of, or United States or foreign patent or equivalent protection for, any of the Gnesys Intellectual Property.

E. (i)   Directly or indirectly using or causing to be used,  except as permitted hereinbelow, any of Plaintiff's  names and marks, including without limitation, GNESYS, HYDRASEP, and HYDRAPASS, or any combination thereof, or any colorable imitations thereof, on signs, decals, or other manner of display or in any promotional materials or telephone directories, or from otherwise suggesting in any way that Defendants' products or services have been approved, endorsed, authorized or sponsored by or are in any way associated or connected with Plaintiff; and

   (ii)  Committing any other acts calculated to cause the public to believe that Defendants' products or services originate with, are approved, endorsed, authorized or sponsored by, or are in some way associated or connected with Plaintiff and from otherwise competing unfairly with Plaintiff.

F. Directly or indirectly representing that they are authorized representatives of Plaintiff, or that they have authority to transact business for or on behalf of Plaintiff.

G. Directly or indirectly inducing, aiding or abetting any other person or company to commit the acts enjoined in  paragraphs 1 through 5 herein.

**THE INDIA PATENT**

On June 23, 1999, Defendant Greene and Manickam Athapa ("Athapa") agreed for Athapa to file patent applications in India in Defendant's name on the patents comprising the Gnesys Intellectual Property. (Def. Post-Hearing Brief, pg. 3). By letter dated July 6, 1999, Athapa informed Greene that he had completed the formalities for filing the patent application in India on the Immiscible Liquid Separator and Method that is the subject of U.S. Patent Number 5,266,191, (Stip. Fact 8), owned in the United States by Plaintiff. On July 13, 1999, Grady M. Garrison, acting as attorney for Plaintiff, sent Athapa a facsimile letter in which he informed Athapa that Defendant had assigned to Plaintiff all of the United States and foreign rights in and to the Immiscible Liquid Separator and Method. (Stip. Fact 9). Greene testified that he telephoned Athapa to "stop the patent" on July 13, 1999 (Transcript, pg. 270, lines 2-4), but at no time did Defendant ask Athapa to withdraw the patent application. (Athapa Dep., pg. 13, lines 16-23; Transcript, page 222, lines 14-16).

On July 22, 1999, Defendant authorized Athapa to be Defendant's patent agent in the matter of the patent application in India. (Stip. Fact 10). Athapa filed the patent application on August 27, 1999.

Defendant received $5,000.00 from Athapa on November 10, 1999 and later applied that payment to the patent application project. (Transcript, pg. 204, lines 7 - pg. 205, line 5).

**THE NU-CORP BUSINESS PLAN**

Defendant Greene prepared the Nu-Corp Business Plan dated January 1, 1998, while he was an officer, director and employee of Plaintiff for the purpose of purchasing Plaintiff's assets. This plan contained information regarding the markets that Plaintiff was planning to enter and identified by product name and description Plaintiff's several products and trademarks comprising the Gnesys Intellectual property that Defendant sought to purchase. (Def. Post-Hearing Brief, pg. 3).

Defendant gave a copy of the Nu-Corp Plan to Gary Green of Morgan Keegan in March, 1999. (Transcript pg. 278, lines 13-28). In October 2000, Defendant also gave a copy of the Nu-Corp Business Plan to Jerry Miller, Riuxing Liu and Lei Zhai. (Transcript, pg. 141, lines 9-21). Defendant directed these latter individuals to use the information contained in the plan, coupled with proprietary and confidential information belonging to Plaintiff that he had stored on the hard drive of his personal computer, to prepare the Entech Plan for the purpose of marketing Defendant's StakPak Oil Recovery System ("StakPak") in China. (Transcript, pg. 133, line 9 - pg. 142, line 25).

The Entech Plan stated that the StakPak introduced the "bubble spin" principle for the separation of immiscible liquids. However, previously existing HYDRASEP literature demonstrates that HYDRASEP introduced such a bubble spin principle. (Transcript, pg. 111, lines 12-20). Furthermore, Defendant admits that similar descriptions exist for both StakPak literature and HYDRASEP literature. (*Id.*)

The Entech Plan was presented to Peter Tsoi of Golden Bridge Enterprises in China in December, 2000 by Jerry Miller and Defendant, who were joint venturers at that time. (Stip. Fact 19) A letter of intent was executed on December 5, 2000, in which Tsoi, Miller, and Defendant intended to market oil separators in China. (Transcript, pg. 23, lines 1-15).

**THE 2001 NU-CORP TECHNOLOGIES BUSINESS PROPOSAL**

In January 2001, Defendant presented the 2001 Nu-Corp Technologies Business Proposal[2] to Gary Green of Morgan Keegan in an attempt to raise money to manufacture and sell Defendant's StakPak design in China. (Transcript, pg. 175, lines 11-17). Although Defendant admits preparing the Nu-Corp Technologies Business Proposal in his deposition, he stated at the hearing that Judy Jones prepared the proposal with his assistance. (Transcript, pg. 172, line 22 - pg. 174, line 10). The 2001 Nu-Corp Proposal is substantially similar to the Entech Plan. (Def. Post-Hearing Brief, pg. 6). Defendant testified that Green of Morgan Keegan made a verbal agreement to furnish sixteen million dollars if Defendants raised four million on his own intiative. However, Green testified that such an agreement did not exist. Green further testified that the 2001 Nu-Corp Technologies Business Proposal represented that a patent for StakPak had been applied for and approved and that it was introducing the bubble spin principle. (Gary Green Dep., pg. 14, lines 1-22)

Defendant also used a photograph in the Entech Plan that depicted the StakPak device operating at a FedEx fueling facility. The photograph of the StakPak contains a device that is the HYDRASEP separator, but that had the label and the Gnesys logo digitally removed. (Transcript, pg. 117, lines 12- pg. 120, line 14).

In March, 2001, Miller informed Preston Grace, Chairman of the Board of Gnesys, of Defendant's deal with Tsoi to market StakPak in China and Defendant's deal with Morgan Keenan to finance the marketing plan. (Def. Post-Hearing Brief, pg. 6). After meeting with Grace, Miller withdrew from the joint venture with Defendant and accepted employment with a business owned by Grace in March, 2001, at a salary of $55,000.00 per year. (Transcript, pg. 58-59).

**Standard**

Plaintiff moves the Court to find Defendants in civil contempt of the Injunction. A party may be found in contempt if the petitioner shows that the respondent "violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Id.* (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987). In a contempt proceeding, "the basic proposition [is] that all orders and judgments of courts must be complied with promptly." *NLRB*, 829 F.2d at 590 (quoting *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers*, 609 F.2d 165, 168 (5th Cir. 1980)). As the Sixth Circuit has held, "civil contempt may be either intended to coerce future compliance with a court's order, or to compensate for the injuries resulting from the noncompliance." *Glover v. Johnson*, 199 F.3d 310, 313 (6th Cir. 1999)(internal citations omitted). Good faith is not a defense in civil contempt proceedings. *Glover*, 934 F.2d at 708. Likewise, wilfulness is not an element of civil contempt, but the state of mind of the contemnor is relevant only in the consideration of sanctions. *Rogers v. Webster*, 776 F.2d 607, 612 (6th Cir. 1985).

In a civil contempt proceeding, the burden is on the petitioner to "prove by clear and convincing evidence that the respondent violated the court's prior order." *Glover*, 934 F.2d at 707. The standard is whether "the defendants took all reasonable steps within their power to comply with the court's order," which includes whether the defendants have "marshal[ed] their own resources, assert[ed] their high authority, and demand[ed] the results needed from subordinate persons and agencies in order to effectuate the course of action required by the [court's order]." *Id*. at 708.

---

[2]The 2001 Nu-Corp Technologies Business Plan is a different entity than the Nu-Corp Business Plan of 1998. While Defendant claims that he has no interest in Nu-Corp Technologies, Defendant's daughter is a part owner.

**Discussion**

Plaintiff moves the Court to find Defendants in contempt of court on six primary issues: (1) Defendants have violated Paragraph 4(b) of the Injunction by directly or indirectly using in any manner, or disclosing to third parties, Plaintiff's trade secrets and proprietary information, namely Plaintiff's confidential information and know-how related to its products and processes, including those for separating two immiscible liquids of different densities, such as oil and water, and from removing sediment therefrom; (2) Defendants have violated Paragraph 4(c) of the Injunction by directly or indirectly claiming ownership of, or any right, privilege, or permission to use, Gnesys Intellectual Property; (3) Defendants have violated Paragraph 4(d) of the Injunction by directly or indirectly pursuing commercial exploitation of, or United States or foreign patent or equivalent protection for, the Gnesys Intellectual Property; (4) Defendants have violated Paragraph 4(e)(i) of the Injunction by suggesting that Defendants' products or services have been approved, endorsed, authorized or sponsored by or are in any way associated or connected with Plaintiff; (5) Defendants have violated Paragraph 4(f) of the Injunction by directly or indirectly representing that they are authorized representatives of Plaintiff, or that they have authority to transact business for or on behalf of Plaintiff; (6) Defendants have violated Paragraph 4(g) of the Injunction by directly or indirectly inducing, aiding or abetting others to commit the acts enjoined.

The Court will discuss each of these issues in turn.

### 1. Whether Defendants violated Paragraph 4(b) of the Injunction

Plaintiff argues that Defendants violated Paragraph 4(b) by disclosing Plaintiff's confidential and proprietary information in the distribution of the 1998 Nu-Corp Business Plan. Plaintiff asserts that confidential information included Plaintiff's anticipated markets of entry, confidential and proprietary business plans and drawings of the HYDRASEP separators customized for TVA, as well as parameters of how the HYDRASEP device operates. Defendant shared this plan with Ruixing Liu, Lei Zhai and Jerry Miller. This information was, in turn, used by Miller and Liu in the preparation of the Entech Plan.

Defendant admits that such information was contained in the 1998 Plan and that this information was indeed shared with others, but argues that it is not protected information under the Injunction. Indeed, Defendant admitted that he had in his possession a standardized drawing of HYDRASEP separators prepared for TVA. (Transcript, pg. 133, line 3 - pg. 134, line 5). Defendant further admitted that he had used a *pro forma* statement of income and expense associated with the HYDRASEP separator in the preparation of the plan. Defendant also admitted that he had taken confidential information of the Plaintiff with him following the termination of his employment and had used drawings of HYDRASEP and HYDRAPASS in the plan. (Transcript, pg. 9, line 133 - pg. 138, line 14).

Defendant argues that the incorporation of this information into the Nu-Corp Business Plan was not in violation of the Injunction since such information was not specifically listed in the Injunction as prohibited from use. (Def. Post-Hearing Brief, pg. 11) Defendant argues that the Injunction's failure to identify those specific bits of information that are protected falls short of the specificity requirements outlined in Rule 65 of the Federal Rules of Civil Procedure.

Instead, Defendant argues that the only information protected by the Injunction was "the secret know-how related to Plaintiff's products and processes ... the secret formulas and Excel spread sheet technical information that describes the internal parameters and set up for the HYDRASEP that is not disclosed in the patents or published marketing literature." (Def. Post-Hearing Brief, pg. 10). Defendant asserts that the information he considered confidential to the

HYDRASEP system was not disclosed in the Indian patent application, nor in the 1998 Plan.(Def. Post-Hearing Brief, pg. 10).

The Court disagrees with Defendant and finds that this information was protected. The drawings of the HYDRASEP and HYDRAPASS products that Defendant admitted he used in his 1998 Plan contained legends stating that such drawings were proprietary and confidential. (Transcript, pg. 142). Additionally, the business plans of Plaintiff contain a legend stating that the plans are confidential and proprietary. (Trial Exh. 19). Grace further testified that the licensing fee agreed upon with TVA to fabricate oil/water separators was confidential and proprietary information of Plaintiff, was not communicated to others by Plaintiff, and would be used by competition to bid at a lower price. (Transcript, pg. 207, lines 20-21; pg. 215, lines 22- page 216, line 12). The Court fails to see how Defendant, who worked for Plaintiff, could not have realized that this was sensitive information belonging to Plaintiff and protected by the Injunction. Defendant testified at the hearing that confidential and proprietary information of Plaintiff included certain formulas, even though they were not specifically listed in the Injunction. (Transcript, pg. 263, lines 5-17). Accordingly, the Court finds that Defendant violated Paragraph 4(b) of the Injunction.

### 2.   Whether Defendants violated Paragraph 4(e) of the Injunction

Plaintiff alleges that Defendant violated Paragraph 4(e) of the Injunction in claiming ownership of, or any right, privilege or permission to use the Intellectual Property. Miller testified that Greene told him that he (Greene) had international marketing rights to the HYDRASEP and would be marketing the HYDRASEP oil/water separator in China.

However, Miller is the only witness that testified to this effect. Since Miller'S credibility was impeached at the hearing,  this evidence does not rise to the level of clear and convincing evidence necessary to find in favor of the Plaintiff. Therefore, the Court  finds that Defendant did not violate Paragraph 4(e) of the Injunction.

### 3.   Whether Defendants violated Paragraph 4(d) of the Injunction

Plaintiff alleges that Defendants violated Paragraph 4(d) by directly or indirectly pursuing commercial exploitation of, or United States or foreign patent or equivalent protection for, Plaintiff's intellectual property. The Court finds that Defendant's pursuit of a patent in India and his incorporation of the HYDRASEP specifications into the StakPak design are violations of this portion of the Injunction.

Defendant authorized Athapa to act as his agent in procuring a patent in India for the HYDRASEP system. This authorization was given prior to the Injunction. However, Defendant did not ask Athapa to withdraw the application at any time after the Injunction, nor did he alert Plaintiff after the Injunction that the application had been filed. Although Defendant asked Athapa to "stop the patent" on July, 1999, he authorized Athapa to be his agent on July 29, 1999 and continued to support the Indian patent application after the injunction was entered on October 26, 1999.

Moreover, Defendant violated paragraph 4(d) in seeking to commercially exploit the intellectual property by developing and promoting the Entech Plan. Several similarities exist between the Entech Plan and the HYDRASEP specifications. The specifications and product descriptions contained in the Entech Plan are exactly those contained in the Plaintiff's specifications and product descriptions for its HYDRASEP device except for the substitution of the word "pressure" for the word "gravity". (Trial Ex. 6 at D178-D188 and Trial Ex. 54, pg. 444-481). Furthermore, Defendant admitted that the HYDRASEP separator was available in a pressure vessel design and could be equipped to function as a crude oil recovery system. (Transcript, pg. 302, line 24 - pg. 304, line 25).

Defendant admitted that the photograph of the alleged StakPak included a device that was a HYDRASEP separator. (Transcript, pg. 117, lines 12 - pg. 120, line 14). Defendant argues, however, that since the photograph does not contain any indicia that the equipment belongs to Plaintiff, he is in compliance with the Injunction as nothing suggests an association between himself and Plaintiff. This argument is unconvincing to the Court. The Court finds that merely removing any insignia that identifies equipment with a particular owner does not absolve Defendant of all responsibility for pursuing commercial exploitation of Plaintiff's intellectual property.

Defendant further argues that to violate Paragraph 4(d), there must have been a sale or profit of equipment belonging to Plaintiff. Since there was not such a sale or profit, Defendant asserts that he could not have engaged in commercial exploitation. The Court disagrees with Defendant's interpretation of "commercial exploitation" as it is used in the Injunction. Plaintiff does not contend that Defendant has used the HYDRASEP separator by buying or selling it, but states that Defendant violated the Injunction by *pursuing* commercial exploitation. The Court agrees that Paragraph 4(d) is aimed at preventing the pursuit of commercial exploitation, and the Defendant's use of the HYDRASEP in its StakPak promotion materials does just that. Also, the incorporation of Paragraph 4(a), explicitly prohibiting Defendant's sale or profit from the HYDRASEP indicates that this matter was considered in the Injunction. Paragraph 4(a) of the Injunction states that Defendant is prohibited from "directly or indirectly making, using, offering to sell, or selling any products, process or services which infringe upon any of the patents identified herein above in Paragraph 2."

### 4.   Whether Defendants violated Paragraph 4(e)(i) of the Injunction

Plaintiff alleges that Defendants violated Paragraph 4(e)(i) of the Injunction by suggesting that Defendant's products or services have been approved, endorsed, authorized or sponsored by Plaintiff.

Even though Plaintiff removed the Gnesys logo from the HYDRASEP device in the picture showcasing the StakPak, its inclusion could lead a viewer of that picture to the conclusion that Defendant's StakPak was associated with Plaintiff, or that Plaintiff's HYDRASEP system was associated with Defendant. Also, the incorporation of verbatim descriptive language of the HYDRASEP device into the 2001 Nu-Corp Technologies Business Proposal given to Gary Green of Morgan Keegan denotes an association between Plaintiff and Defendant. Accordingly, the Court finds that Defendant violated Paragraph 4(e)(i) of the Injunction.

### 5.   Whether Defendants violated Paragraph 4(f) of the Injunction

Plaintiff argues that Defendant has violated Paragraph 4(f) of the Injunction by directly or indirectly representing that he is an authorized representative of Plaintiff, or that they he has the authority to transact business for or on behalf of Plaintiff. Once again, Plaintiff relies solely on the testimony of Miller to establish the fact that Defendant represented to Miller that he had marketing rights to the HYDRASEP separator outside the U.S. and Canada and that he would be marketing the HYDRASEP in China. The Court finds that since Miller's credibility has been impeached, his testimony does not rise to the level of clear and convincing evidence necessary to hold the Defendant in violation of this provision.

### 6.   Whether Defendants violated Paragraph 4(g) of the Injunction

Plaintiff argues that Defendant has violated Paragraph 4(g) of the Injunction by directly or indirectly inducing, aiding, or abetting others to commit the acts enjoined as set forth above. Namely, Plaintiff points to the fact that Defendant induced Jerry Miller, Riuxing Liu, and Lei Zhai to participate in the preparation of the Entech Plan. Plaintiff also asserts that Defendant induced Judy Jones to participate in the preparation of the 2001 Nu-Corp Technologies Business Proposal.

Defendant does not dispute that he directed Miller, Liu, and Zhai to form a business plan to market the StakPak in China using the 1998 Nu-Corp Business Plan as a template. Defendant admitted that he had used confidential and proprietary information belonging to the Plaintiff in the preparation of the 1998 Nu-Corp Plan. Additionally, Defendant gave these individuals permission to use the information that was on his computer consisting of protected information belonging to Plaintiff. Much of the information that was included in the resulting Entech Plan was the same information that was in the 1998 Nu-Corp Plan. The 2001 Nu-Corp Technologies Business Proposal prepared by Judy Jones was substantially similar to the Entech Plan. Accordingly, the Court finds that Defendant's actions in enlisting the assistance of these individuals for the commercial exploitation of Plaintiff's proprietary and confidential information violates Paragraph 4(g) of the Injunction.

**Conclusion**

For the reasons listed above, the Court finds, by clear and convincing evidence, that Defendant violated Paragraphs 4(b), 4(d), 4(e)(i), and 4(g) of the Injunction. The evidence supports a finding that the Defendants' actions were wilful and intentional in that Boyd Greene acted in disregard of the intellectual property rights of the Plaintiff and without sound reason to believe that the rights were not infringed. Plaintiff shall submit within twenty (20) days any documents and materials necessary to support an award of damages, either compensatory or punitive.

ENTERED this *26th* day of November, 2002.

/s/

_____
JON P. McCALLA
UNITED STATES DISTRICT JUDGE