In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2844

PHOENIX ENTERTAINMENT PARTNERS,
LLC and SLEP-TONE ENTERTAINMENT
CORPORATION,

*Plaintiffs-Appellants*,

*v.*

DANNETTE RUMSEY and BASKET CASE
PUB, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:15-cv-01009-JBM-JEH — **Joe Billy McDade**, *Judge.*

ARGUED FEBRUARY 12, 2016 — DECIDED JULY 21, 2016

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and
BLAKEY, *District Judge*.[*]

---

[*]  The Honorable John Robert Blakey, of the Northern District of Illinois,
sitting by designation.

ROVNER, *Circuit Judge.*  Slep-Tone Entertainment Corporation and its successor in interest, Phoenix Entertainment Partners, LLC[1] (collectively, "Slep-Tone") contend in this litigation that the defendants, a pub and its owner, committed trademark infringement by passing off unauthorized digital copies of Slep-Tone karaoke files as genuine Slep-Tone tracks. *See Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 580 (7th Cir. 2005) (describing passing off and reverse passing off cases). Because we agree with the district court that Slep-Tone has not plausibly alleged that the defendants' conduct results in consumer confusion as to the source of any tangible good sold in the marketplace, we affirm the dismissal of its complaint.

## I.

This suit is one of more than 150 that Slep-Tone has filed throughout the country invoking the Lanham Act, 15 U.S.C. § 1051 *et seq.*, to challenge the unauthorized copying and performance of its commercial karaoke files as a form of trademark infringement. For the better part of three decades, Slep-Tone has produced and distributed karaoke accompaniment tracks under the trademark "Sound Choice." These tracks are designed for professional karaoke systems and include both audio and graphic (visual) components. The audio component is a re-recorded version of a popular song that omits the lead vocals, as those will be performed by the karaoke singer or singers. The graphic component displays the

---

[1]   Phoenix Entertainment Partners LLC purchased certain assets of Slep-Tone Entertainment Corporation, including the trademarks and trade dress at issue in this case, after this litigation commenced.

lyrics to the song as well as a variety of visual cues (including color coding and various icons) that are synchronized with the music in order to aid the singers. Slep-Tone has released over 16,500 karaoke versions of popular songs.

In addition to the Sound Choice trademark (which was registered in 1995 and thereafter renewed), Slep-Tone also claims ownership of a distinctive trade dress that distinguishes its tracks from those of its competitors. This trade dress includes the typeface, style, and visual arrangement of the song lyrics displayed in the graphic component of the accompaniment tracks; a display version of the Sound Choice mark (which has been separately registered since 1996) that is itself typically shown with the song lyrics; and the style of entry cues that are displayed for karaoke singers (including a series of vanishing rectangles) to signal when they should begin to sing. Slep-Tone alleges that it has used this trade dress for decades, and that it is sufficiently recognizable to karaoke customers to enable them to distinguish a track produced by Slep-Tone and a track produced by a competitor even if the Sound Choice mark itself were not displayed.

Slep-Tone sells its karaoke accompaniment tracks to customers on both CD+G compact discs (with the +G referring to the graphic component) and MP3+G media. Technology now enables these tracks to be copied onto the hard drives of karaoke equipment, such that one karaoke machine may host hundreds or thousands of accompaniment tracks. Karaoke

singers and "jockeys"[2] thus have many songs from which to make their selections, and the accompaniment track for the chosen song is immediately available without someone having to physically insert a disc into the karaoke machine and wait for the appropriate track to be "loaded" onto the system. The process of copying the purchased CD+G or MP3+G version of a track onto the hard drive of a karaoke system is known as "media-shifting," because the content is being shifted from one medium to another, or "format-shifting," because in the copying process the content is being converted into a different electronic format. Needless to say, the same technology that enables a karaoke operator to make an authorized copy of a track also makes possible the creation of unauthorized copies. An operator may copy a legitimately-purchased track from its original medium onto any number of hard drives; it may copy a patron's tracks onto its own hard drive; it may "swap" tracks with other operators through file-sharing websites; it may purchase a hard drive that someone else has preloaded with tracks; and it may re-sell its original media to other operators after it has copied the tracks onto its own hard drives.

In 2009, Slep-Tone adopted a media-shifting policy that permits its customers to copy the tracks they have purchased, so long as they comply with four conditions. First, there must be a 1:1 correspondence between the tracks purchased and copies made. In other words, for every track copied onto a customer's hard drive, the customer must own and maintain the track on its original medium. So, if an operator wants to

---

[2] Much like a disc jockey, a karaoke jockey is someone who manages, plays, and introduces karaoke music at a venue or event.

have copies of a particular track on two different hard drives, it must purchase two discs with the original content. Second, once a copy has been made, the purchased track on its original medium must be kept "on the shelf" and not used for any purpose. Third, upon making a copy, the operator must notify Slep-Tone that it has media-shifted the track. And fourth, the operator must submit to an audit to certify its compliance with the media-shifting policy.

It should come as no surprise that not all operators comply with Slep-Tone's media-shifting policy. Slep-Tone alleges that karaoke operators have engaged in widespread and unauthorized copying of its tracks. Whereas Slep-Tone pays royalties to the copyright owners of the original musical works incorporated into its derivative karaoke accompaniment tracks, it is repeatedly deprived of revenue when karaoke operators make multiple, unauthorized copies of Slep-Tone's Sound Choice tracks.

The Basket Case Pub, Inc., one of the two defendants in this case, is an Illinois corporation that operates an eating and drinking establishing in Peoria, Illinois known as The Basket Case. Dannette Rumsey, the other defendant, is the president and sole owner of that corporation. Like most venues offering karaoke entertainment, The Basket Case provides karaoke services free of charge in order to attract patrons and encourage them to buy food and drinks. The defendants own one or more hard drives containing copies of Sound Choice tracks. However, those copies allegedly were made by or at the behest of the defendants in violation of Slep-Tone's media-shifting policy. In other words, the defendants are allegedly playing

illegitimate "bootleg" copies instead of authorized copies properly made from legitimately-acquired Slep-Tone media.

Slep-Tone's second amended complaint asserts claims for both trademark infringement and unfair competition under the Lanham Act. Its theory, as we discuss in greater detail below, is that when the defendants play unauthorized copies of Slep-Tone karaoke tracks at the pub, customers see Slep-Tone's Sound Choice mark and trade dress and believe they are seeing and hearing a legitimate, authentic Slep-Tone track, when in fact they are seeing an unauthorized copy. Slep-Tone characterizes the unauthorized copy of its track as a distinct good which the defendants are improperly "passing off" as a genuine Slep-Tone track. In addition to the two federal claims, Slep-Tone's complaint includes two pendant state law claims for violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, and for common law unfair competition. For their part, the defendants have filed three counterclaims seeking a declaration that the plaintiffs' mark and trade dress are invalid and unenforceable. After finding that Slep-Tone's two Lanham Act claims failed to state a claim on which relief could be granted, the district court relinquished jurisdiction over the state claims and dismissed the defendants' counterclaims as moot. For purposes of this appeal, the relevant portion of the district court's decision is its analysis of the Lanham Act claims.

Key to the district court's decision to dismiss Slep-Tone's claims of trademark infringement was its conclusion that the factual allegations of the complaint did not plausibly suggest that the defendants' unauthorized use of Slep-Tone's trademark and trade dress is likely to cause confusion among

customers of The Basket Case as to the source of any tangible good containing the karaoke tracks they are seeing and hearing. Such confusion, the court noted, is a prerequisite to relief under either of the two sections of the Lanham Act on which Slep-Tone's claims were based. And as is clear from the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37, 123 S. Ct. 2041, 2050 (2003), it is consumer confusion about the source of a tangible good that a defendant sells in the marketplace that matters for purposes of trademark infringement. The defendants do not sell any such tangible good. According to the complaint, the defendants simply play unauthorized copies of Slep-Tone's karaoke tracks for their patrons. What pub patrons see and hear is the intangible content of the karaoke tracks. They will see Slep-Tone's trademark and trade dress and believe, rightly, that Slep-Tone is the source of that intangible content. But patrons will neither see nor care about the physical medium from which the karaoke tracks are played; consequently, any confusion is not about the source of the tangible good containing the karaoke tracks. Slep-Tone's real complaint, then, is one about theft, piracy, and violation of Slep-Tone's 1:1 media policy rather than trademark infringement. R. 13.

## II.

Phoenix's two federal claims for trademark infringement are brought under sections 32 and 43 of the Lanham Act. 15 U.S.C. §§ 1114, 1125. The Lanham Act "established a federal right of action for trademark infringement to protect both consumer confidence in the quality and source of goods and businesses' goodwill in their products." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672 (7th Cir. 2001) (citing *Peaches*

*Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 692 (5th Cir. 1995)). A trademark is any word, name, symbol, or device, or any combination thereof, used to identify a person's good and to distinguish it from those goods manufactured or sold by others. 15 U.S.C. § 1127. Section 32 specifies a cause of action for the unauthorized use of a registered trademark. As relevant here, that section renders a person liable in a civil suit when he "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" § 1114(a). More broadly, section 43(a) of the Act creates a remedy against a person who engages in unfair competition by, *inter alia*, falsely designating the origin of a product. Section 43(a)(1), in relevant part, imposes liability on "[a]ny person who, on or in connection with any goods or services … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, … which—(A) is likely to cause confusion, or to cause mistake, or to deceive … as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … ." § 1125(a)(1)(A). To prevail on either type of claim, a plaintiff must be able to show (1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers. *CAE*, 267 F.3d at 673-74 (collecting cases).

Slep-Tone is the owner of the Sound Choice trademark for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing

video related to musical compositions" along with the display version of that mark. R. 20 at 7-8 ¶¶ 42, 43. It is also the owner of distinctive and protectable trade dress associated with its graphical displays. This trade dress includes (1) the use of a particular typeface, style, and visual arrangement in displaying the lyrics to a song, (2) the Sound Choice marks themselves, and (3) the use of particular styles in displaying entry cues for karaoke performers, specifically a series of vanishing rectangles to indicate the cue. R. 20 at 8 ¶ 46. Slep-Tone has used this trade dress continually and exclusively for a period of decades, so much so that, as noted earlier, karaoke performers can readily recognize a graphical display as one produced by Slep-Tone wholly apart from the display of the Sound Choice mark itself.

Slep-Tone's theory of the case proceeds as follows. When a person, without authorization from Slep-Tone, copies a Sound Choice karaoke track onto a different medium (a computer hard drive, for example) from the original CD+G or MP3+G medium distributed by Slep-Tone, that person creates a new good that is distinct from Slep-Tone's product. But the copy, when played, will still display both the registered Sound Choice marks along with each of the other elements of the trade dress we have described. Thus, when an unauthorized copy is played at The Basket Case, patrons of the pub will think that the copy is a genuine Sound Choice track that was manufactured by Slep-Tone and purchased by or otherwise licensed to the defendants. In fact, however, it is not a Sound Choice product, but rather is being passed off as such by the defendants. This amounts to trademark infringement under section 32 and unfair competition under section 43(a) of the

Lanham Act, in plaintiffs' view. Plaintiffs allege that the unauthorized use of their trademark and trade dress is likely to cause confusion or mistake among customers and patrons who view the unauthorized copy, or to deceive such customers and patrons, by leading them to believe that the track is a bona fide Sound Choice track manufactured by Slep-Tone and sold or licensed to the defendants. Viewers may also be led to believe, mistakenly, that Slep-Tone has sponsored or otherwise approved the defendants' services and commercial activities.

The pathway between the defendants' alleged trademark infringement and Slep-Tone's claimed injuries is indirect. Note that the defendants do not compete with Slep-Tone in the market for karaoke tracks, in that they do not sell karaoke products or services to karaoke jockeys or other establishments like The Basket Case. But Slep-Tone alleges that the defendants, by not paying for genuine Sound Choice tracks and instead using unauthorized copies, artificially lower their own costs of doing business and thereby exert illegitimate and unfair pressure on legitimate operators in the same region who incur higher expenses for authorized karaoke tracks and therefore must charge more to their customers in order to recoup their expenses. For a comprehensive library of Slep-Tone tracks, for example, a legitimate karaoke jockey or other karaoke operator can expect to spend up to $40,000 on top of the $25,000 cost of the karaoke system itself. To the extent the unfair competition discourages legitimate operators from paying for genuine Slep-Tone tracks, Slep-Tone is ultimately deprived of sales.

Apart from that pecuniary injury, Slep-Tone suggests that unauthorized copying may result in inferior knock-offs that

will injure its reputation for quality karaoke tracks. Typically, the complaint alleges, a karaoke singer or observer will be unable to discern whether the track being played resides on an original disc or a copy, despite the inevitable step-down in quality that occurs when a track is copied from its original medium. Nonetheless, if the data is compressed excessively in the duplication process, a bad copy may result, such that when the copy is played, the sound and/or the graphics may be inferior.[3] A customer viewing such a copy may thus come to associate the Sound Choice mark with a sub-par product. In that way, unauthorized copying jeopardizes the reputation for high-quality karaoke tracks that Slep-Tone has cultivated for decades. Slep-Tone alleges that one of the goals of its 1:1 media-shifting policy, and the right to conduct an audit that the policy reserves to Slep-Tone, is to assess the integrity of the copies that its customers are making. Unauthorized copies, such as those attributed to the defendants here, evade that audit process.

We may assume for purposes of our analysis that the injuries as described are sufficiently connected with the

---

[3] This is a suggestion that has been developed more in the briefing and argument than in the complaint itself. The complaint does allege that media-shifting usually results in a copy that is inferior in quality to the original, although it also acknowledges that the difference is typically not discernable to the patron of a bar or restaurant. R. 20 at 4-5 ¶¶ 22-23. The complaint further alleges that one purpose of Slep-Tone's 1:1 policy is to help ensure the integrity of media-shifted tracks. R. 20 at 6 ¶ 32. But, as the district court pointed out, there is no affirmative allegation that the defendants or anyone else have made, or caused to be made, copies that a consumer would recognize as inferior. R. 13 at 17 n.7.

defendants' alleged violations of the Lanham Act to support Slep-Tone's claims, notwithstanding the defendants' argu-ments to the contrary. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) ("we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute"). Although the connection between the defendants' actions and Slep-Tone's pocketbook is, as we have said, indirect, we may assume without deciding that it is not "'too remote' from the [defendants'] unlawful conduct" to support relief. *Id.*

It is significant, however, that what lies at the heart of the defendants' alleged wrongdoing is the unauthorized copying of Slep-Tone's karaoke tracks. It is undisputed that those tracks, the audio and visual components of which were arranged specifically for karaoke accompaniment, constitute derivative works that enjoy protection under the Copyright Act. *See* 17 U.S.C. §§ 102(a), 103; *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197-1200 (10th Cir. 2005). The unauthorized copying of a creative work is typically the province of copyright law. *See* 17 U.S.C. § 106 (granting to copyright owner exclusive right to, *inter alia*, reproduce, distribute, perform and display copyrighted work, and to authorize such actions); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 492 (4th Cir. 1996) ("The copyright is the author's right to prohibit the copying of the author's intellectual invention, i.e. the originality of an author's expression."); *see also, e.g.*, *Hobbs v. John*, 722 F.3d 1089, 1094 (7th Cir. 2013) (citing unauthorized copying as an essential element of a claim for copyright infringement). And there is no

doubt that, on the facts alleged, Slep-Tone would have a perfectly viable claim for copyright infringement against the defendants, *if* Slep-Tone owned the copyright on these tracks. We are told it does not. Slep-Tone *does* own the Sound Choice trademarks and associated trade dress, which explains why Slep-Tone has cast its lot with trademark rather than copyright law. But the fit between Slep-Tone's claims and trademark law is imperfect. As we have discussed, Slep-Tone theorizes that whenever someone copies one of its tracks onto a different medium, he or she is creating a distinct product that, when played, is being "passed off" as a genuine Slep-Tone product. Apart from the fact that the defendants are not in the business of selling karaoke tracks, one oddity of this theory is that it also describes what a legitimate customer would do within the constraints of Slep-Tone's 1:1 policy. As we have already discussed, a typical karaoke operator would want to make and assemble copies of its karaoke tracks onto the hard drive of its equipment for easy access rather than using the original media it has purchased from vendors like Slep-Tone. So a Slep-Tone customer who makes an *authorized* copy of a Sound Choice track onto a computer hard drive would likewise be creating a distinct good, and when that copy was played and the Sound Choice mark is displayed among the graphics, viewers would be led to believe, mistakenly, that this copy is a genuine Sound Choice track, when in fact it is not. As Slep-Tone's counsel acknowledged at oral argument, all that distinguishes the legitimate copy from the illegitimate copy is authorization to make the copy—and that sounds much more like a claim of copyright infringement than a claim of trademark infringement.

There are important distinctions between the two claims. The aim of copyright is to foster creative works of authorship, including literary, musical, cinematic, and architectural works. It achieves that end by granting to the author a legal monopoly over the performance and copying of the work for a substantial, but nonetheless finite, period of time. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774, 782 (1984).[4] Once the copyright expires, the work enters the public domain and is freely subject to copying and performance without the owner's permission. *See Dastar*, 539 U.S. at 33, 123 S. Ct. at 2048; *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255, 1260 (2001). Patent law strikes a similar bargain in the field of scientific and mechanical invention: The inventor is given exclusive rights over his creation for a specified period of time, after which the public is free to use and copy the invention at will. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480-81, 94 S. Ct. 1879, 1885-86 (1974).

Trademark, by contrast, is aimed not at promoting creativity and invention but rather at fostering fair competition. By protecting source-identifying marks, and proscribing "the deceptive and misleading use of [such] marks," 15 U.S.C. § 1127, trademark achieves that end in two ways: (1) it simplifies consumer choice, by enabling consumers to rely on a mark that readily identifies a particular brand and producer, and (2)

---

[4]   The Constitution prohibits the renewal of copyrights in perpetuity. *See* U.S. CONST. art. I, § 8, cl. 8 (restricting copyright ownership to a "limited time[ ]"); *Dastar*, 539 U.S. at 37, 123 S. Ct. at 2050 (citing *Eldred v. Ashcroft*, 537 U.S. 186, 208, 123 S. Ct. 769, 783 (2003)).

it assures the producer of a particular good that it, and not an imitating competitor, will reap the financial rewards of the good's (or the brand's) reputation. *See Dastar*, 539 U.S. at 34, 123 S. Ct. at 2048 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64, 115 S. Ct. 1300, 1303 (1995)); *Ty Inc. v. Perryman*, 306 F.3d 509, 510 (7th Cir. 2002); *see also Top Tobacco, L.P. v. N. Atl. Operating Co.*, 509 F.3d 380, 381 (7th Cir. 2007). And, unlike a copyright, a trademark can be renewed in perpetuity. *Qualitex*, 514 U.S. at 165, 115 S. Ct. at 1304.

Although the rights protected by trademark and copyright laws are distinct, it can in some cases be challenging to identify which right is truly at issue when a claim of infringement is asserted. Not infrequently, the owner of the trademark for a particular good may not own the copyright on the expressive content of that good, just as the owner of the mark on a good subject to patents may not own the patent rights. That is true of Slep-Tone, which controls the Sound Choice marks but does not control the copyright on the creative elements of the karaoke tracks. And where, as here, the protected mark (including the trade dress) is embedded in the good's creative content, such that the mark is invariably displayed along with the content, it can be particularly difficult to decide whether the unauthorized copying of the good presents a claim of trademark infringement or one of copyright infringement.

The Supreme Court's decision in *Dastar* nonetheless makes clear that the law of trademark cannot be invoked to assert what in fact is really a claim of copyright infringement, so our endeavor to decide into which camp Slep-Tone's claim falls must begin with that decision. The facts of *Dastar* are suffi-

ciently different from those at issue here that we do not regard its holding as controlling the result in this case. Nonetheless, *Dastar* informs our analysis and ultimately guides us to the conclusion that Slep-Tone's claimed injuries are not the result of trademark infringement.

The plaintiff in *Dastar* was Twentieth Century Fox Film Corporation ("Fox"), which in the late 1940s acquired the television rights to then-General Eisenhower's book, *Crusade in Europe*—an account of the Allied Powers' World War II campaign in Europe—and produced a 26-part television series by the same name. When the copyright on the series expired in 1977, Fox failed to renew it, and the series thus entered the public domain. Although Fox had allowed the copyright on the *Crusade* series to expire, it later re-acquired the television rights to the Eisenhower book along with the exclusive right to distribute the *Crusade* series on video and to license others to do so. In 1995, with the 50th anniversary of the war's end approaching, defendant Dastar Corporation purchased a copy of the original *Crusade* television series, condensed it, made other relatively minor modifications, gave the revised series a new title (*World War II Campaigns in Europe)*, designed new packaging, and marketed the revised *Campaigns* series on videotape as its own product, with no credit to Fox. Fox in turn sued for trademark infringement under section 43(a) of the Lanham Act, charging Dastar with "reverse passing off," *i.e.*, holding out to the public what was really Fox's product as Dastar's own product, and thereby falsely designating the product's origin.

The Supreme Court concluded that Dastar's copying and repackaging of the series was not actionable as trademark infringement under section 43(a). The Court noted at the outset that:

> [T]he gravamen of [Fox's] claim is that, in marketing and selling *Campaigns* as its own product without acknowledging its nearly wholesale reliance on the *Crusade* television series, Dastar has made a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which … is likely to cause confusion … as to the origin … of his or her goods." § 43(a).

539 U.S. at 31, 123 S. Ct. at 2046 (italics ours). Given the nature of Fox's claim, the Court viewed the essential question as what the Lanham Act means by "origin" of "goods." If "origin" as used in the statute refers only to the producer of the physical goods (here, the videotapes), Dastar was the origin of those goods (and had not misrepresented itself as such), but if "origin" includes the creator of the underlying work, then Fox might be the origin of the good, and Dastar might be culpable for leading purchasers of its videotapes to believe otherwise. In the Court's view, "the most natural understanding of the 'origin' of 'goods'—the source of wares—is the producer of the tangible product sold in the marketplace, in this case the physical *Campaigns* videotape sold by Dastar." *Id.* at 31, 123 S. Ct. at 2047 (italics ours).

"It could be argued, perhaps," the Court acknowledged, that there should be a broader understanding of the "origin of goods" for communicative products like books or videos that

are valued primarily for their intellectual content rather than for their physical qualities. *Id.* at 33, 123 S. Ct. at 2047. A more expansive understanding might include not only the producer of the physical good, but the creator of the content conveyed by the good, as the "origin." *Id.*, 123 S. Ct. at 2047-48.

But the Court saw that argument as creating a "conflict with the law of copyright, which addresses that subject specifically." *Id.*, 123 S. Ct. at 2048. The Court noted that the copyright holder's rights "are part of 'a carefully crafted bargain,'" *id.*, 123 S. Ct. at 2048 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51, 109 S. Ct. 971, 977 (1989)), balancing an author's interest in exclusive control over his creative work during the copyright period with the public's interest in having unfettered access to that work once the copyright has expired. Trademark law was meant to protect a different set of interests and, in contrast to copyright, does not impose a sunset date on the rights it protects. Extending the "origin of goods" to include the producer of creative content conveyed by a book, video, or other physical good, so that a false representation of the origin of the creative content supports a claim of trademark infringement, would result in "a species of mutant copyright law that limits the public's federal right to copy and use expired copyrights." *Id.* at 34, 123 S. Ct. at 2048 (internal quotation marks and citation omitted). *See Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) ("*Dastar* held that trademark law cannot be used to obtain rights over the content of an artistic work; that would amount to an indefinite extension of a copyright.").

In short, considering the different scopes and ends of trademark and copyright law, the Court read the "origin of goods" as used in the Lanham Act to refer solely to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar*, 539 U.S. at 37, 123 S. Ct. at 2050. As the producer of the tangible goods it offered for sale—the videotapes themselves—Dastar, and not Fox, was the "origin" of those goods and had made no false representations in that regard. Dastar therefore bore no liability under the Lanham Act. *Id.* at 38, 123 S. Ct. at 2050.

*Dastar*, as we have acknowledged, is not directly controlling of the result in this case. The defendants are not accused of putting their own mark on Slep-Tone's product and presenting it to the public as their own product, as was the charge in *Dastar*. Instead, as we have discussed, the defendants are accused of passing off their own "good"—the unauthorized copy of Slep-Tone's karaoke track—as Slep-Tone's good. Rather than removing the Sound Choice display mark from the copied track, the defendants have allowed it to remain, so that when the copy is played, customers will see the mark and (erroneously) attribute the copy to Slep-Tone.

Despite the factual differences between *Dastar* and this case, *Dastar*'s rationale informs our analysis in two important respects. First, *Dastar* emphasizes the important distinctions between copyright and trademark law, and cautions against allowing a trademark claim to substitute for what in real terms is a claim for copyright infringement. *See Eastland Music Grp.*, 707 F.3d at 872 ("*Dastar* tells us not to use trademark law to

achieve what copyright law forbids."); *see also EMI Catalogue P'ship v. Hill, Holliday, Connors Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000) ("cases involving trademark infringement should be those alleging the appropriation of symbols or devices that identify the composition or its source, not the appropriation or copying or imitation of the composition itself"). Second, *Dastar* considered and rejected a broader understanding of the "origin of goods" for communicative products that consumers will value more for the intellectual and creative content they convey than for their physical form. 539 U.S. at 33, 123 S. Ct. at 2047-48. That category of goods includes, in addition to the documentary videotapes at issue in *Dastar*, the karaoke tracks at issue in this case. Even as to these types of communicative goods, the Court made clear that the "good" whose "origin" is material for purposes of a trademark infringement claim is the "tangible product sold in the marketplace" rather than the creative content of that product. 539 U.S. at 31, 123 S. Ct. at 2047; *see Eastland Music Grp.*, 707 F.3d at 872 ("Only a confusion about origin supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product sold in the marketplace.'") (quoting *Dastar*, 539 U.S. at 31, 123 S. Ct. at 2047).

In evaluating Slep-Tone's claims of trademark infringement, we must therefore ask ourselves what the tangible good at issue is, and whether the unauthorized use of the plaintiffs' marks (including trade dress) might cause consumers to be confused about who produced that good. Or is the real confusion, if any, about the source of the creative conduct contained within that good? If the latter, the confusion is not actionable under the Lanham Act.

Here, the good that Slep-Tone alleges the defendants are improperly passing off as a Slep-Tone product is the unauthorized digital copy of the Sound Choice karaoke track (duplicated from the original CD+G compact disc or MP3+G media supplied by Slep-Tone) made (or obtained from others) by the defendants. We shall assume, perhaps counter-intuitively, that a digital file counts as a tangible good for purposes of the trademark analysis. *See Slep-Tone Entm't Corp. v. Sellis Enters., Inc.*, 87 F. Supp. 3d 897, 905 n.4 (N.D. Ill. 2015) (citing *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936 (E.D. Va. 2010), and 37 C.F.R. § 6.1(9)). Any number of communicative products—books, music, movies, computer software—are now bought and sold in digital form, many of them exclusively so. But the question for our purposes is what, if any, tangible "good" the consumer sees, and whether the use of the plaintiffs' trademark leads to confusion about the source of that particular good.

Recall that the defendants are not alleged to be in the business of selling copies of karaoke tracks, as they might be if their customers were other karaoke operators looking to assemble their own libraries of karaoke tracks, for example. The defendants instead are alleged to play the unauthorized copies for their bar patrons to encourage alcohol and food sales. So what the pub patrons see is the performance of the creative work contained on the copies: they hear the musical accompaniment and they see the corresponding lyrics and graphics.

It is not alleged, nor does the briefing suggest, that the patrons see the physical good in question—the digital file that presumably resides on the hard drive of the bar's karaoke

system. Even if a patron might be aware that there is such a file, she does not see that file or the medium on which it resides, as she might if she were purchasing a karaoke track on a compact disc from a dealer or as a download from an internet website, for example. The patron sees only the performance of the creative content of the digital file. So far as the patron is concerned, the content could be played from a compact disc, the pub's karaoke hard drive, or from an internet streaming source. Whatever the source, the consumer sees and hears the same content and her perception of that content will be essentially the same.[5]

It is true that the pub patron will see the Sound Choice mark and trade dress whenever the graphical component of the karaoke tracks is displayed. This, according to the plain-tiffs, is what gives rise to confusion as to the source of the good containing those tracks: Patrons may assume it is a genuine, authorized Slep-Tone product when in fact it is a bootleg copy. But about *what* exactly is the patron confused? On seeing the Sound Choice mark, a patron may believe that she is seeing and hearing content that was created by Slep-Tone. And she is. *Compare Harbour v. Farquhar*, 245 F. App'x 582 (9th Cir. 2007) (nonprecedential decision) (individual defendant and his production company falsely represented himself as author of digitalized musical compositions licensed to television and film producers). But what *Dastar* makes clear is that a consumer's

---

[5]   *See* Second Amended Complaint, R. 20 at 5 ¶ 23 ("In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from the original, provided the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.").

confusion must be confusion as to the source of the tangible good sold in the marketplace. *Fortress Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 701 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 981 (2015); *Eastland Music Grp.*, 707 F.3d at 872; *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp., supra*, 419 F.3d at 580; *cf. Harbour*, 245 F. App'x 582 (for purposes of section 43(a) false-designation-of-origin claim, completed films and television programs were relevant goods as opposed to musical compositions embodied within those goods).

A consumer of karaoke services like a patron of The Basket Case never sees a disc that is wrapped in Slep-Tone or Sound Choice packaging. He never sees a website offering downloads of Sound Choice tracks. As we have said, the defendants' patrons are not direct purchasers of karaoke tracks. They simply see and hear the karaoke tracks that The Basket Case plays for them. They have no interaction with the medium from which the tracks are played, in the way that a karaoke jockey might. Any confusion, in short, is not about the source of the tangible good sold in the marketplace, as *Dastar* requires.

That the Sound Choice mark is embedded in the creative content of the karaoke track and is visible to the public whenever the track is played does not falsely suggest that Slep-Tone is endorsing the performance, as the plaintiffs have alleged. The producers of communicative goods often embed their marks not only on the packaging of the good but in its content. Cinematic films, for example, typically display the mark of the studio that made the film in the opening and/or closing credits—think of Metro- Goldwyn-Mayer Studios' roaring lion. When the copyright on such a creative work

expires, enabling any member of the public to copy and use the work without license, it is not a trademark violation simply to display the work without first deleting the mark that was inserted into its content. Thus, as the district court pointed out in *Slep-Tone Entm't Corp. v. Canton-Phoenix Inc.*, a movie theater may freely exhibit a copy of Universal Studios' 1925 silent film, *The Phantom of the Opera*, which is now in the public domain, without fear of committing trademark infringement simply because Universal's registered trademark will be displayed when the film is played. 2014 WL 5824787, at *11 (D. Ore. Sep. 4, 2014) (report & recommendation), *adopted as modified*, 2014 WL 5817903 (D. Ore. Nov. 7, 2014), *appeal pending* (9th Cir.) (No. 14-36018). So long as Universal's mark is not overtly used to market the performance, there is no risk that a theater patron might think that Universal is sponsoring or endorsing the performance. *Id.* Likewise, another media company is free to make and sell copies of the film without deleting Universal's mark from the credits (or obtaining a license from Universal), so long as the packaging and advertisement of the tangible good on which the copy is fixed and offered to the consumer (a DVD or blu-ray disc, for example) does not use Universal's mark and thereby suggest that it is a Universal-produced or -endorsed copy. *Id.*; *see also Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 596 (9th Cir. 2000) (unauthorized use of clip from The Three Stooges' film in another motion picture did not constitute unfair competition under Lanham Act notwithstanding plaintiff's contention that clip contained elements that amounted to trademark; in contrast, had defendant used a likeness of The Three Stooges on t-shirts it was selling, there might be arguable claim of trademark violation); *cf. Societe*

*Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962) ("The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the name of the designer to do so. Indeed it is difficult to see any other means that might be employed to inform the consuming public of the true origin of the design. [By contrast,] [t]hose cases involving sponsorship, whether trademark infringement or unfair competition, protecting the owner of the mark, are based upon a finding that the defendant's goods are likely to be thought to have originated with, or to have been sponsored by, the true owner of the mark.") (citations omitted); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 545-46 (5th Cir. 1998) (distinguishing permissible, nominative use of rival's trademark as discussed in *Societe Comptoir* and similar cases from impermissible use that gives rise to confusion as to source, sponsorship, or approval of good), *abrogated on other grounds by TrafFix Devices*, *supra*, 532 U.S. 23, 121 S. Ct. 1225. Because the creative content of the karaoke tracks at issue in this case presumably remains subject to copyright protection, the unauthorized display and performance of those tracks may well present an actionable claim of copyright violation, as we have said. But the routine display of Slep-Tone's embedded trademark during the performance of the tracks does not, without more, support a claim of trademark infringement or unfair competition under the Lanham Act.

Here, there is no allegation nor suggestion in the briefing that The Basket Case promotes itself as offering Sound Choice karaoke products—in its advertising or in its karaoke menus,

for example. There is, consequently, no reason to believe that its patrons will think that Slep-Tone is sponsoring the performance of the copied karaoke tracks. And because patrons see only the creative content of the tracks rather than the particular medium from which the tracks are played, there is no reason to think that they believe that the digital file, wherever it resides, was itself produced or approved by Slep-Tone.[6]

We have considered Slep-Tone's concern that if the data contained on one of its products is compressed excessively during the duplication process, the quality of an unauthorized copy may be poor and, when played, may lead viewers to think Slep-Tone products are of inferior quality. (Although the same danger may be present when a Slep-Tone customer makes an authorized copy, we shall assume that the auditing process referred to in the complaint takes care of this.) Quality is always a concern in passing-off cases: Not only is the trademark holder deprived of sales, but the counterfeit goods sold under its trademark place the holder's goodwill at risk to the extent the goods are of inferior quality. *See*, *e.g.*, *Coca-Cola Co. v. Stewart*, 621 F.2d 287, 291 (8th Cir. 1980). But the problem for Slep-Tone, apart from the fact that it does not affirmatively allege that the defendants' copies are noticeably inferior to their patrons, *see* n.3, *supra*, is that the defendants are not passing off a tangible good sold in the marketplace as a Slep-Tone good. As we have discussed, the defendants are not selling compact discs with karaoke tracks and billing them as

---

[6] We have little doubt if The Basket Case removed the Sound Choice mark from its copies of the karaoke tracks before playing them for its patrons, the plaintiffs would be here on a different kind of complaint.

genuine Slep-Tone tracks, in the way that a street vendor might hawk knock-off Yves Saint Laurent bags or Rolex watches to passers-by. Whatever wrong the defendants may have committed by making (or causing to be made) unauthorized copies of Slep-Tone's tracks, they are not alleged to have held out a tangible good sold in the marketplace as a Slep-Tone product. Consequently, the defendants' alleged conduct is not actionable as trademark infringement.

### III.

For all of the reasons we have discussed, we AFFIRM the dismissal of Slep-Tone's complaint.